ABC, INC., Plaintiff,

v.

PRIMETIME 24, JOINT VENTURE, Defendant.

No. Civ. A. 1:97CV00090.

United States District Court, M.D. North Carolina.

July 16, 1998.

See also, 17 F.Supp. 478.

McLendon Humphrey & Leonard, L.L.P., Raleigh, NC, for ABC, Inc., plaintiff.

W. Andrew Copenhaver, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, Pressly McAuley Millen, Womble Carlyle Sandridge & Rice, Raleigh, NC, Andrew Z. Schwartz, Stephen B. Deutsch, Richard M. Brunell, Daniel H. Haines, Foley Hoag & Eliot, LLP, Boston, MA, for Primetime 24, Joint Venture, defendant.

James Henry Jeffries, IV, Amos & Jeffries, L.L.P., Greensboro, NC, for Andrew S. Fisher, deponent.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case presents a copyright dispute arising under 17 U.S.C. § 119 (the "Satellite Home Viewer Act" or "SHVA") and 17 U.S.C. § 501 *et seq.* The case is presently before the court on Plaintiff's motion for summary judgment. For the reasons that follow, the court will grant Plaintiff's motion and find Defendant liable for copyright infringement.[1]

## BACKGROUND

The material facts are not in dispute and are established by the pleadings, depositions, declarations, and exhibits furnished by the parties.

The Plaintiff, ABC, Inc. ("ABC") owns and operates the television station WTVD in Durham, North Carolina. WTVD is a primary network station of The ABC Television Network and televises the programming of that network on Channel 11 within its local market. The local market is the geographic area encompassed within WTVD's "predicted Grade B contour." *See* 17 U.S.C. § 119(d)(11). The predicted Grade B contour is a circular area extending approximately seventy-five miles from the base of WTVD's transmitting tower, located five miles east of Garner, North Carolina. It

Reid L. Phillips, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, Wade Hampton Hargrove, Brooks Pierce

---

1. Also pending before the court is Plaintiff's motion to strike the jury demand presented in Defendant's answer. The court's ruling on Plaintiff's motion for summary judgment moots consideration of the motion to strike because the only remaining issues bear on the equitable remedies sought by Plaintiff, which are questions for the court rather than a jury. *See* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2312 (2d ed.1995).

represents the predicted reach of WTVD's broadcast signal. The signal is strongest at the center of the contour. At its boundary, fifty per cent of the households are estimated with fifty per cent accuracy to receive a broadcast signal of Grade B intensity fifty per cent of the time.

Defendant PrimeTime 24, a Joint Venture ("PrimeTime") is a satellite carrier. It is engaged in the business of uplinking by satellite the programming of various broadcast networks' television stations and reselling the programming of these stations to satellite dish owners throughout the country. From early 1989 to the present date, PrimeTime has uplinked by satellite and resold to dish owners located within WTVD's local market the signals of various distant television stations affiliated with The ABC Television Network. The ABC network programs broadcast by those distant television stations substantially duplicate the ABC network programming broadcasts by WTVD. Although a subscriber in Raleigh to which PrimeTime has sold its service will receive the network and local programming of WKRN (ABC's Nashville affiliate) and KOMO (ABC's satellite affiliate), it will not receive any of the local news, public service announcements, or commercials broadcast by WTVD.

PrimeTime relies upon the statutory copyright license available to satellite carriers under the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, for the right to uplink and transmit ABC network programming. SHVA grants to satellite carriers a limited and conditional compulsory license to uplink distant network broadcast stations by satellite and retransmit the programming of those stations to certain eligible households. SHVA defines eligible households as those that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of Grade B intensity (as defined by the Federal Communications Commission) of a primary network station affiliated with that network" and have not "within 90 days before the date on which that household subscribes [to receive network programming via satellite] ... subscribed to a cable system that provides the signal of a primary network station affiliated

with that network." 17 U.S.C. § 119(d)(10)(A) & (B). This restriction on eligibility is known as the "white area restriction" because it limits eligible households to those in areas that are not served by local television stations and have not recently received cable television. SHVA also requires the satellite carriers to pay royalties for every subscriber and furnish broadcast networks a monthly list of the names and addresses of their new subscribers and a list of terminated subscribers. The networks then compile the subscriber list for each local television market and provide them to their local affiliates. The local affiliates are charged with the responsibility of challenging any subscriber in its local market that it believes ineligible to receive network programming via satellite.

PrimeTime has taken the position that because the purpose of SHVA was to provide persons that could not receive clear pictures on their television set with access to network programming via satellite, whether or not a potential subscriber is eligible depends upon the clarity of the broadcast picture that the subscriber receives. PrimeTime has systematically incorporated this interpretation of SHVA into its screening procedures. Almost all of PrimeTime's subscribers are signed up by independent distributors such as DirecTV. PrimeTime's distributor contracts permit the distributors to authorize subscribers to receive network programming through PrimeTime after the distributor asks about the household's reception of over-the-air network stations. PrimeTime provides a specific script for that purpose. The potential subscriber is asked three questions in order to determine whether or not PrimeTime will provide network programming: (1) If he intends to use the service for private residential purposes; (2) If he has received cable service within the last three months; and (3) If he can receive an acceptable over-the-air picture with a conventional rooftop antenna. Before asking the third question, PrimeTime suggests that its distributors tell potential subscribers that, if they say they receive an acceptable quality picture, they will not be eligible to receive network services. PrimeTime also conducts training and monitoring of its distributors' customer-service person-

nel in order to ensure that only subscribers that claim to have a poor quality picture receive their services. PrimeTime never tested the signal strength at any of its subscribers' households prior to this suit. Former PrimeTime CEO Sid Amira testified that although a signal strength test is necessary "to be totally determinative" of whether a household could receive a Grade B signal, Amira Dep. at 100, PrimeTime found such testing "to be too expensive and nonconclusive [sic] as to whether the household gets a viewable acceptable picture." *Id.* at 105–06.

ABC and the other broadcast networks have taken a different interpretation of SHVA. ABC believes that SHVA's restriction of eligible households to those that "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of Grade B intensity," 17 U.S.C. § 119(d)(10)(A), constitutes an objective test of signal strength that satellite carriers can forego only at their peril. However, the networks and the satellite carriers have not been able to agree upon an industry standard for conducting such measurements.

When a network station challenges the eligibility of PrimeTime's subscribers under the white area restriction, PrimeTime's practice is to send letters and questionnaires to the subscribers involved, informing them that their eligibility has been challenged and that, unless they can provide information confirming their eligibility, their service will be terminated. In the Raleigh–Durham market, PrimeTime took the additional step of sending such questionnaires to every subscriber through the end of 1997 who lived in zip codes located within WTVD's predicted Grade B contour—whether or not WTVD had challenged their eligibility. The cover letter accompanying this questionnaire informed the subscriber of ABC's suit. The letter sets forth PrimeTime's position that it "is not authorized to distribute satellite transmissions of network television stations to households that can receive an 'acceptable' over-the-air signal from their local network station through the use of a conventional rooftop receiving antenna." (Levi Decl.Ex. N). The letter also informs the subscriber that ABC is seeking an injunction that would

prevent PrimeTime from distributing any ABC network programming to any satellite dish user in the Raleigh–Durham area. If the subscriber believes that he "cannot receive WTVD clearly using a conventional rooftop antenna," *id.,* the letter requests him to complete and return the accompanying questionnaire. The questionnaire asks the subscriber to describe his type of residence and indicate his reception of WTVD by checking boxes labeled "clear," "snowy," "ghosting," "sparkle," "lines," or "other." The questionnaire also asks if the subscriber has a conventional television antenna on his roof. If not, the subscriber is asked to indicate whether he believes the reception with such an antenna would be clear or poor. He is then asked to base his conclusion on one or both of two options: "prior experience with a rooftop antenna" or "neighbor's experience with a rooftop antenna." (*Id.*) The majority of those responding indicated that they did not receive a clear picture using a rooftop antenna. Those who did receive a clear picture, as well as those who did not respond to the questionnaire, had their network programming terminated. Although PrimeTime at one time had approximately 35,000 subscribers in the Raleigh–Durham market, that number was down to about 11,700 as of April 2, 1998, with an additional 2,700 scheduled for deauthorization. PrimeTime continues to accept new subscribers on the basis of their representations that they do not receive a clear picture, rather than conducting any signal strength tests. After this lawsuit was filed, between February 1, 1997, and November 30, 1997, PrimeTime signed up 221 subscribers who live in Garner or Clayton, towns within six miles of WTVD's broadcast tower.

After failing to resolve its differences with PrimeTime regarding SHVA's requirements, ABC filed suit in January 1997. ABC alleged that PrimeTime's uplinking and rebroadcast of distant network affiliates and its failure to submit complete subscriber lists on a timely basis constitute infringements of ABC's copyrights in its network programming under 17 U.S.C. §§ 119(a)(3) and (a)(5). ABC seeks declaratory and injunctive relief as well as attorney's fees and the costs of this action.

## DISCUSSION

PrimeTime asserts that genuine issues of fact remain as to (1) whether or not it provided service to households that were not "unserved" within the meaning of SHVA; (2) whether any violations of the statutory scheme were "willful or repeated;" or (3) whether it engaged in a "pattern or practice" of willful or repeated violations. The court will address each of these issues in turn.

### I. Copyright Infringement by Service to Ineligible Households

Because there is no dispute as to the underlying facts of this case, the question of whether or not PrimeTime's actions constitute copyright violations is simply a matter of law. To establish a *prima facie* case of copyright infringement, ABC must show that it holds the copyrights for the televised exhibition of the network programs within WTVD's local market and that PrimeTime has broadcast these network programs without obtaining a license. *See* H.R.Rep. No. 103–703, at 13–14 (1994). There is no dispute that ABC holds the copyright in the programming carried by the ABC television network and broadcast by WTVD. There is also no dispute that an affiliation agreement between ABC and WTVD grants the latter the right to broadcast ABC television network programming and provides the former with standing to sue for infringements by PrimeTime within WTVD's local service area. Finally, there is no dispute that PrimeTime has resold and transmitted the programming of The ABC Television Network to numerous subscribers within WTVD's local market without obtaining a license from ABC to do so. PrimeTime's resale of ABC network programming therefore constitutes a copyright violation, unless PrimeTime can fit within the compulsory license created by Congress in the Satellite Home Viewer Act ("SHVA") *See Columbia Pictures v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 282 (9th Cir.1989) ("A plain reading of the [copyright act's] transmit clause indicates that its purpose is to prohibit transmissions and other forms of broadcasting from one place to another without the copyright owner's permission.").

### A. The Satellite Home Viewer Act ("SHVA")

Congress adopted SHVA in 1988 in order to facilitate the delivery of broadcast network programming by satellite to dish owners who, because of distance or other factors, are unable to receive an acceptable signal from a local television station affiliated with that network. Congress had two purposes in passing the Act: (1) to enable households located beyond the reach of a local affiliate's broadcast signal to obtain access to network programming via satellite; and (2) to preserve the existing national network-local affiliate television program distribution system. *See* H.R.Rep. No. 100–887(I) at 8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5611.

The Act created a limited and conditional statutory copyright license for satellite carriers authorizing them to uplink a distant network broadcast station—without securing that station's consent and without having to purchase in the open market the copyrights in the programming—and retransmit that station's programming by satellite for "private home viewing" to so-called "unserved" households. SHVA defines an "unserved" household as one that (1) "cannot receive, through the use of a conventional outdoor rooftop receiving antenna, an over-the-air signal of Grade B intensity (as defined by the Federal Communications Commission)," 17 U.S.C. § 119(d)(10)(A), and (2) has not recently received network programming by means of cable television, 17 U.S.C. § 119(d)(10)(B). PrimeTime argues that whether or not a household is served or unserved turns on the subscriber's reported picture quality. The court cannot agree. The statute says nothing about the television viewer's clarity of reception. Rather, the plain language of the statute adopts the FCC's definition of a Grade B signal to determine whether a household is eligible. *CBS, Inc., et al. v. PrimeTime 24*, 9 F.Supp.2d 1333 (S.D.Fla.1998).

PrimeTime disputes that SHVA has a plain meaning and argues that the statute is ambiguous because the FCC nowhere defines "an over-the-air signal of Grade B intensity."

The legislative history of this section of the statute references 47 C.F.R § 73.683(a), a regulation which defines "field strength contours."[2] PrimeTime argues that the FCC's definition of median field strength contours has nothing to do with whether a particular household can receive, through the use of a conventional outdoor rooftop antenna, an over-the-air signal "of Grade B intensity." Although Section 73.683(a) concededly was drafted with other purposes in mind, Congress can clearly adopt by reference, in whole or in part, any portion of the Code of Federal Regulations which it considers relevant to defining a new statutory term. It is apparent that Congress has done so here. SHVA's reference to "an over-the-air signal of Grade B intensity (as defined by the Federal Communications Commission)" most naturally refers to the dBu's required for a signal of Grade B strength for each particular channel. WTVD broadcasts on Channel 11. Reading SHVA together with Section 73.683(a) produces the conclusion that an unserved household in WTVD's local market is one that cannot receive a signal of 56 dBu with a conventional outdoor rooftop antenna and has not recently received network programming via cable television.

PrimeTime also argues that SHVA cannot be read to require individual testing because there is no industry standard on how signal strength is to be measured. The FCC regulations, for example, do not define how the signal strength at a subscriber's household should be measured. The FCC directs that field strength measurements shall be made utilizing a receiving antenna, elevated thirty feet above the ground and oriented toward the strongest signal, and measured over a mobile run of at least 100 feet. *See* 47 C.F.R. § 73.686(b)(2). The satellite and broadcast industries have been unable to agree on the proper method of measuring signal strength at individual households. Nevertheless, PrimeTime cannot rely on the lack of consensus on how to measure signal strength to justify its failure to conduct measurements of any kind.

PrimeTime next argues that the court should look beyond the plain meaning of the statute because requiring PrimeTime to forego a signal-strength test in a subscriber's household only at its peril would produce the "absurd" result of driving every satellite carrier out of business. Although each test would cost from $150.00 to $200.00, each subscriber pays only $4.00 to $7.00 per month for network programming services from PrimeTime. It is an accepted canon of statutory interpretation that when the literal application of a statute produces a result "demonstrably at odds with the intentions of its drafters, [then] those intentions must be controlling." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). Because of the unavoidably subjective nature of this inquiry, courts should apply with caution the "absurd result" exception to the enforcement of a statute's plain meaning.

Where the language of a statute is clear in its application, the normal rule is that we are bound by it. There is, of course, a legitimate exception to this rule.... Where the plain language of the statute would lead to patently absurd consequences that Congress could not *possibly* have intended, we need not apply the language in such a fashion. When used in a proper manner, this narrow exception to our normal rule of statutory construction does not intrude upon the law-making powers of Congress, but rather demonstrates a respect for the co-equal Legislative

**2.** The FCC defines field strength contours as follows:
(a) In the authorization of TV stations, two field strength contours are considered. These are specified as Grade A and Grade B and indicate the approximate extent of coverage over average terrain in the absence of interference from other television stations. Under actual conditions, the true coverage may vary greatly from these estimates because the terrain over any specific path is expected to be different from the average terrain on which the field strength charts were based. The required field strength, $F(50,50)$, in dB above one microvolt per metèr (dBu) for the Grade A and Grade B contours are as follows.

|  | Grade A(dBu) | Grade B(dBu) |
| --- | --- | --- |
| Channels 2–6 | 68 | 47 |
| Channels 7–13 | 71 | 56 |
| Channels 14–69 | 74 | 64 |

Branch, which we assume would not act in an absurd way.

This exception remains a legitimate tool of the Judiciary, however, only as long as the court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result, and where the alleged absurdity is so clear as to be obvious to most everyone.... [L]oose invocation of the 'absurd result' canon of statutory construction creates too great a risk that the court is exercising its own WILL instead of JUDGMENT, with the consequence of substituting its own pleasure to that of the legislative body.

*Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 470–71, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring in the judgment) (emphasis in original) (internal quotation marks and citations omitted). Even if the plain meaning of the statute produces an absurd result, for the court to correct this error "the meaning genuinely intended but inadequately expressed must be absolutely clear," *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 82, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (Scalia, J., dissenting). Otherwise, the court "might be rewriting the statute rather than correcting a technical mistake." *Id.*

PrimeTime points to portions of the legislative history which it argues demonstrate that Congress would not have wanted the satellite carriers driven out of business. *See* H.R.Rep. No. 103–703, at 15 (1994) (Congress capped the number of households to be tested in a transitional site measurement testing scheme at five per cent of the satellite carriers' subscribers in any local market "[i]n order not to impose undue financial burdens on satellite carriers"); H.R.Rep. No. 100–887(I), at 19 (1988) (stating that satellite carriers must be reasonably diligent in avoiding and correcting violations "through an internal compliance program that includes methods of confirmation of household eligibility such as customer questionnaires, sample site signal measurements, and periodic audits"). The court finds that consideration of

SHVA'S legislative history would not help PrimeTime, because this legislative history repeatedly indicates that SHVA's test for an unserved household depends upon the measurement of the local affiliate's signal strength. The House Report accompanying the 1988 bill repeatedly states that the purpose of SHVA is to provide network programming to those that cannot receive a sufficiently strong signal. *See* H.R.Rep. 100–887(I), at 15 ("The distribution of network signals is restricted to unserved households; that is, those that are unable to receive an adequate over-the-air signal ...."); *id.* ("In essence, the statutory license applies in areas where the signals cannot be received via rooftop antennas or cable."); *id.* at 18 ("The bill confines the license to the so-called 'white areas,' that is, households not capable of receiving a particular network by conventional rooftop antennas...."); H.R.Rep. No. 100–887(II), at 26 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5638, 5655 (a subscriber's household "must be able to receive the signal of a primary network station to fall outside the definition of unserved household") (internal quotation marks omitted).

This understanding was replicated in the 1994 amendments to SHVA, which did not alter the definition of an unserved household. The House Report stated that Congress enacted SHVA so that "households that cannot receive over-the-air broadcasts or cable can be supplied with television programming via home satellite dishes." H.R.Rep. No. 103–703, at 5 (1994). The "white area restriction" limiting delivery of network signals via satellite to unserved households "actually refers to those geographic areas where subscribers *are unable to receive the signal of a particular network over-the-air*." S.Rep. No. 103–407, at 5 n. 2 (1994) (emphasis added). An unserved household "must not be able to receive, through the use of a conventional outdoor rooftop antenna, an over-the-air signal of Grade B intensity as defined by the FCC. *This objective test can be accomplished by actual measurement*." *Id.* at 9 & n. 4 (emphasis added); *see also* H.R.Rep. No. 103–703, at 13 ("[T]he household must not be able to receive, through the use of a conventional outdoor rooftop antenna, an over-the-air signal of Grade B intensity as defined by

the FCC. *This is an objective test, accomplished by actual measurement.*") (emphasis added); and *id.* at 14 n. 6 ("The term 'predicted Grade B contour' as used in this Act refers to the area referred to currently in Rule 73.684 of the Rules of Federal Communications Commission, as the area predicted to receive a signal from a network station of at least Grade B intensity). By contrast, the definition of an 'unserved household' in Section 119(d)(10) refers to the use of a conventional outdoor rooftop receiving antenna to receive 'an over-the-air signal of Grade B intensity' as defined by the FCC, *thereby requiring that the household actually receive a signal of that intensity.*") (emphasis added).

Although the plain language of SHVA produces a hard result for PrimeTime insofar as it requires that satellite carriers may forego signal-strength testing only at their peril, "[t]he remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this court." *Griffin,* 458 U.S. at 576, 102 S.Ct. 3245. Although Congress may amend SHVA, this court may not. This court concludes, as did the Southern District of Florida in *CBS,* that Congress clearly defined a Grade B signal based upon the FCC's objective standard and not on whether a household receives a picture of acceptable quality. *See CBS* at 1336. SHVA therefore defines "unserved household" by reference to the FCC's objective standard and not by finding that the household receives less than an acceptable picture quality.

### B. *Prima Facie Case of Copyright Infringement Under Section 119(a)(5)(A)*

■ A satellite carrier that makes "willful or repeated secondary transmissions" of network programming to households that are not "unserved" is subject co the remedies for

copyright infringement found in Section 501 *et seq.* PrimeTime bears the burden of proof about whether a subscriber's household is eligible under SHVA to receive network programming via satellite. *See* 17 U.S.C. § 119(a)(5)(D). In support of its argument that its subscribers in WTVD's market are in fact eligible, PrimeTime offers only three items of evidence. First, each of its current subscribers responded to a PrimeTime questionnaire by stating that he does not receive a clear picture. PrimeTime argues that picture quality correlates with signal strength and thus one can infer that these respondents do not receive a Grade B signal.[3] Second, a subscriber must pay for network services; it is not bundled together with other services. PrimeTime argues that one can infer from the fact that subscribers pay extra for network programming that they do not receive adequately strong signals. Third, PrimeTime submits the report of its expert witness, stating that at five of fourteen subscriber homes tested within WTVD's local market, WTVD's signal was below Grade B strength.

This evidence falls woefully short of carrying PrimeTime's burden of proving that its subscribers are in fact eligible. All that it proves is that five of PrimeTime's subscribers within WTVD's local market are eligible. PrimeTime argues that the court should not read SHVA to require a signal-strength test as the only acceptable evidence of whether a household can receive a signal of Grade B intensity. PrimeTime argues that a subscriber's declaration that he could not receive a clear signal constitutes sufficient evidence of eligibility. In support of this position, PrimeTime cites portions of the legislative history which it believes indicate that Congress was primarily concerned with providing network programming by satellite to those who could not receive adequate pic-

---

**3.** This argument is inconsistent with the testimony of former PrimeTime CEO Sid Amira: "[W]e find the [signal strength] testing to be too expensive *and nonconclusive [sic] as to whether the household gets a viewable acceptable picture.*" (Amira Dep. at 105–06) (emphasis added). In written testimony submitted to the United States Copyright Office regarding proposals to modify SHVA, Sid Amira made other statements that undermine PrimeTime's current position: "[S]ig-

nal strength *does not correlate* with picture quality," (Pl.'s Resp. to Def.'s Surreply Mem. in Opp'n to Pl.'s Mot. for Summ.J., App. A, at p. 4) (emphasis added); "[T]he SHVA test *does not correlate* to picture quality in a significant number of households," (*Id.* at p. 3) (emphasis added); and "*No correlation* was found between signal strength and picture quality," (*Id.* at p. 5) (emphasis added).

tures over the air. *See* H.R.Rep. No. 100–887(I) at 18 (some households "cannot receive clear signals"); H.R.Rep. No. 100–887(II), at 19 (small percentage of television households "cannot now receive clear signals"); *id.* at 15 (SHVA addresses the problem that millions of "households are in areas where the receipt of off-air network signals is not possible or is of unacceptable quality"). PrimeTime also cites a portion of the legislative history which it believes indicates that Congress specifically contemplated use of subscriber questionnaires to determine subscriber eligibility. *See* H.R.Rep. No. 100–887(I), at 19 ("[P]ossibilities for error ... [may] occur despite reasonably diligent efforts to avoid them (because of variables such as customer self-reporting and engineering tests of signal adequacy)").

Even considering SHVA's legislative history, however, the court cannot agree with PrimeTime's argument. First, the reference to "customer self-reporting" is ambiguous insofar as it is equally likely to refer to the other prerequisites for eligibility (*i.e.*, the customer's private home use of network programming and the household's lack of recent cable service). More importantly, Congress rejected the bill proposed by PrimeTime and other satellite carriers that would have permitted viewers to receive network services by satellite if they submitted affidavits indicating that they did not receive adequate service over the air. The rejection of a proposal analogous to PrimeTime's present interpretation of SHVA provides clear evidence that the statute does not mean what PrimeTime says it means. *See Tanner v. United States,* 483 U.S. 107, 125, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); *CBS,* 9 F.Supp.2d at 1343 (S.D.Fla.1998). Because PrimeTime cannot carry its burden to demonstrate subscriber eligibility, it cannot avail itself of SHVA's statutory license in order to broadcast network programming to its subscribers in WTVD's local market, with the exception of the five subscribers which testing revealed do not receive a signal from WTVD of Grade B intensity.

■ SHVA provides that a copyright violation exists where a satellite carrier makes the "willful *or* repeated secondary transmis-

sion" of a primary transmission made by a network station to a subscriber who does not reside in an unserved household. 17 U.S.C. § 119(a)(5)(A) (emphasis added). SHVA's use of the disjunctive "or" means that liability will accrue for either "willful" secondary transmission or "repeated" secondary transmission. PrimeTime argues that it has not acted willfully unless it knew that its acts constituted infringement. ABC argues that PrimeTime acted willfully if its actions were not accidental. The court need not resolve this dispute because PrimeTime's secondary transmission of network programming to ineligible households was clearly "repeated" within the meaning of SHVA.

SHVA's legislative history indicates the phrase "willful or repeated" was meant to have the same meaning as those words were used in the Cable Compulsory Licensing Act, 17 U.S.C. § 111. *See* H.R.Rep. No. 100–887(I), at 21 ("The words 'willful or repeated' are used in the same context in section 119(a) as the words are used in section 111(c)."). A defendant has acted willfully or repeatedly within the meaning of Section 111 where it has been grossly negligent in complying with its statutory duties. *See* H.R.Rep. No. 94–1476, at 93 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5708 (" 'Repeated' does not mean 'merely more than once'; rather, it denotes a degree of aggravated negligence which borders on wilfulness."); *Columbia Pictures Indus., Inc. v. Liberty Cable, Inc.,* 919 F.Supp. 685, 690 (S.D.N.Y.1996) (defendant liable for "willful or repeated" violations upon a finding that "on several occasions, the defendant could have or should have known of its responsibilities under [the Act] and that defendant continuously disregarded its obligations."). The requirement of gross negligence comports with the congressional intent not to hold satellite carriers liable for mere good faith mistakes. At a minimum, therefore, PrimeTime has committed a "willful or repeated" violation of Section 119 if it was grossly negligent in meeting its statutory obligations.

■ This court has no difficulty concluding that no reasonable fact finder could fail to find that PrimeTime was grossly negligent in complying with its duties under SHVA.

Indeed, substantial evidence exists that PrimeTime's violation of SHVA's white area restriction was willful. The undisputed evidence shows that PrimeTime was aware of the Grade B signal standard:

● Primetime lobbied Congress in the drafting of SHVA to reject the objective Grade B signal standard in favor of a subjective picture quality standard. Congress rejected this option. PrimeTime then urged the United States Copyright Office to recommend to Congress that SHVA be amended to delete the Grade B signal standard in favor of a subjective subscriber assessment of picture quality.

● In mailings to subscribers regarding SHVA, PrimeTime stated that their service may be terminated "based upon a complex technical standard in the law" rather than "the quality of the picture on your TV set." (Pl.'s Resp. to Def.'s Surreply Mem. in Opp'n to Pl.'s Mot. for S.J., App. B).

● In a recorded telephone message to persuade subscribers to lobby Congress to rewrite SHVA, PrimeTime stated that "[u]nder the current law, your ability to view satellite network TV is based upon the intensity of the signal you receive from your local station, *not based upon the quality of the picture on your TV set.*" (Pl.s Ex. 33).

● Former PrimeTime CEO Sid Amira testified that the only way "to be totally determinative" that a subscriber's household is unserved and thus eligible to receive network programming via satellite is to conduct a signal strength test at the subscriber's household. (Amira Dep. at 100).

● PrimeTime has nevertheless provided network programming to approximately 35,-000 households in WTVD's local market without first conducting any signal strength tests. In fact, PrimeTime has conducted only seventeen tests of the signals received at a subscriber's household, and only fourteen of these households were within WTVD's local market. Although these tests revealed that WTVD's over-the-air signal was of at least Grade B field strength at nine of fourteen subscriber households within the local market, PrimeTime continued to retransmit ABC network programming to its subscribers within WTVD's local market.

● PrimeTime continued to enlist subscribers within WTVD's local market without conducting signal strength tests, even after ABC filed this lawsuit. More than 200 of these new subscribers reside in towns less than seven miles from WTVD's broadcasting tower.

In opposition to this mountain of evidence, PrimeTime can muster only a protestation of good faith. Although PrimeTime knew of the governing legal standard, it nevertheless chose to adopt one it found more convenient. PrimeTime was broadcasting network programming to thousands of subscribers who received a signal of Grade B intensity as defined by Congress. PrimeTime has simply ignored the Grade B test even though it tried and failed to persuade Congress to adopt a test of eligibility based upon subscriber declarations about over-the-air reception. "A good faith belief as to what the law should be, or what you want the law to be, is not enough." *Columbia Pictures,* 919 F.Supp. at 690. The court therefore finds that there is no material dispute that PrimeTime's transmissions to ineligible households were grossly negligent and "repeated."

C. *Prima Facie Case of Copyright Infringement Under Section 119(a)(5)(B)(ii)*

SHVA states that if PrimeTime has engaged in "a willful or repeated pattern or practice" of delivering network programming to subscribers who do not reside in unserved households, then the court "shall" order a permanent injunction barring the secondary transmission by PrimeTime of ABC network programming. 17 U.S.C. § 119(a)(5)(B)(ii). Although the statute does not define "pattern or practice," the legislative history states that no pattern or practice exists unless over twenty per cent (20%) of a defendant satellite carrier's subscribers in a local market are ineligible to receive network programming. *See* H.R.Rep. No. 100–887(I), at 19 ("[I]t is the intent of this statute that no pattern or practice be found if . . . less than 20% of the subscribers to a particular network station . . . are found ineligible."). As discussed *su-*

*pra,* no reasonable fact finder could fail to find that PrimeTime's violations of SHVA are "willful or repeated." The court must also conclude that no reasonable fact finder could fail to find that PrimeTime's actions constitute a pattern and practice of statutory violation. Although PrimeTime has over 11,000 subscribers in the Raleigh–Durham market, it can show that of these only five meet SHVA's criteria for eligibility. Even if PrimeTime does terminate the additional 2,700 ineligible subscribers scheduled for deauthorization, the failure of proof for all but five out of the remaining 9,000 subscribers within WTVD's local market compels the conclusion that far more than twenty per cent of PrimeTime's subscribers in this market are ineligible.[4] Furthermore, PrimeTime's substitution of a subjective picture quality test for SHVA's objective signal strength test in its "compliance" program led to systematic violation of SHVA's white area restriction. As a matter of law, therefore, PrimeTime's service to ineligible subscribers in WTVD's market constitutes a pattern and practice of willful or repeated copyright infringement within the meaning of Section 119(a)(5)(B)(ii).

ABC has shown a *prima facie* case of copyright infringement entitling it to relief under Sections 119(a)(5)(A) and (a)(5)(B)(ii). PrimeTime has raised, however, three affirmative defenses: estoppel, unclean hands, and waiver. Whether or not PrimeTime is successful in asserting these defenses, they are relevant only to the question of the scope of equitable relief necessary for PrimeTime's violations of SHVA's white area restriction. *See* 17 U.S.C. §§ 119(a)(5)(A) & (a)(5)(B)(ii). The court will therefore address these issues, to the extent necessary, at a subsequent hearing on ABC's request for injunction under these sections of SHVA.

## II. *Reporting Violations*

ABC also claims that PrimeTime has failed to comply with SHVA's reporting requirements. Section 119(a)(2)(C) requires that satellite carriers provide the networks with lists of their subscribers within each network affiliate's local market. ABC states that PrimeTime twice did not provide the subscriber list in a timely manner and that PrimeTime repeatedly provides lists lacking critical address information such as the subscriber's street address and county. Section 119(a)(2)(C) requires satellite carriers to submit to the networks "a list identifying (by name and street address, including county and zip code)" all subscribers to which the satellite carrier provides network programming. 17 U.S.C. § 119(a)(2)(C). Furthermore, "on the 15th of each month, the satellite carrier shall submit to the network a list identifying (by name and street address, including county and zip code) any persons who have been added or dropped as such subscribers since the last [such] submission." *Id.* "The willful or repeated secondary transmission to the public by a satellite carrier of a [network station's] primary transmission ... is actionable as an act of infringement ... where the satellite carrier ... has failed to make the submissions to networks required by [Section 119(a)(2)(C) ]." 17 U.S.C. § 119(a)(3).

The most natural grammatical reading of this section suggests that the phrase "willful or repeated" modifies only the nearby verb "transmission." Under this construction, the phrase "willful or repeated" would not modify the failure to make the required submissions to the network. It is the failure to make the submissions, however, which transforms the otherwise legal conduct ("transmission to the public by a satellite carrier") into copyright infringement. This natural grammatical reading of the statute therefore suggests that "willful or repeated" transmissions are simply transmissions that the satellite carrier intended to make or repeatedly made and thus liability for failing to make the required submissions to the networks is strict. There is nothing in SHVA's legislative history to contradict this reading of Section 119(a)(3).

PrimeTime does not dispute that it has provided incomplete subscriber lists. Ronald

---

4. Tests conducted by PrimeTime's own expert showed that of fourteen homes tested in the local market, WTVD's signal exceeded 56 dBu's at nine of the homes. Thus, over sixty-four per cent of the subscribers tested in WTVD's local market were ineligible for PrimeTime's services.

478

Levi, PrimeTime's officer in charge of compliance with SHVA, has admitted that PrimeTime would accept a subscriber for service without knowing his county of residence. PrimeTime also does not dispute that it has occasionally failed to submit its lists in a timely manner. Rather, PrimeTime argues that it is unreasonable to expect it to produce these lists on a monthly basis and that delays in processing subscriber information were the fault of both itself and ABC. These arguments are insufficient to defeat liability under Section 119(a)(3). As mentioned above, PrimeTime has made "willful or repeated" secondary transmissions of network programming to the public. It has also admitted its failure to supply ABC with complete and timely subscriber lists. ABC has therefore demonstrated a *prima facie* case of copyright infringement under Section 119(a)(3). Because the court's decision on the scope of equitable relief appropriate for PrimeTime's violation of SHVA's white area restriction may moot the relief necessary for PrimeTime's non-compliance with SHVA's reporting requirements, the court will address both issues at a subsequent hearing on ABC's remedies.

### CONCLUSION

For the foregoing reasons, the court finds that there is no genuine dispute that PrimeTime engaged in a willful or repeated pattern or practice of transmitting ABC programming to households ineligible for such service under the Satellite Home Viewer Act, and thus ABC is entitled to judgment as a matter of law on its claim of copyright infringement. The court also finds that there is no genuine dispute that PrimeTime has failed to comply with its reporting requirements under the Act.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### *ORDER*

For the reasons stated in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that the parties shall appear before the court for hearing on the scope of any court-ordered remedy at 2:00 P.M. on Thursday, July 23, 1998, in Greensboro, North Carolina.

IT IS FURTHER ORDERED that prior to the scheduled hearing the parties shall meet and confer and endeavor to reach agreement on the scope of any court-ordered remedy and be prepared to present any proposed agreement to the court at the hearing.