**NATIONAL FOOTBALL LEAGUE, Plaintiff,**

v.

**PRIMETIME 24 JOINT VENTURE, Defendant.**

**No. 98 CIV. 3778 AJP.**

United States District Court, S.D. New York.

Feb. 6, 2001.

---

Robert S. Loigman, Friedman Kaplan & Seiler LLP, New York, NY, Eric Seiler, Friedman, Kaplan & Seiler LLP, New York, NY, for National Football League.

Roger L. Zissu, Fross, Zelnick, Lehrman & Zissu, P.C., New York, NY, Brandon F. White, Foley, Hoag & Eliot, LLP, Boston, MA, for PrimeTime 24 Joint Venture.

## OPINION AND ORDER (WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW)

PECK, United States Magistrate Judge.

This case arises from PrimeTime's satellite transmission of copyrighted NFL football game telecasts to viewers in Canada. In April 2000, the Second Circuit affirmed Judge McKenna's permanent injunction prohibiting PrimeTime from transmitting NFL football games to Canada. *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir.2000), *aff'g*, 98 Civ. 3778, 1999 WL 760130 (S.D.N.Y. Sept.27, 1999), & 1999 WL 945031 (S.D.N.Y. Oct.19, 1999). The issue presently before this Court is the amount of statutory damages, attorneys' fees and costs to be awarded to the NFL for PrimeTime's infringement. The parties have consented to decision by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 64.)

For the reasons set forth below, the Court awards plaintiff NFL $2,557,500 in statutory damages and $45,792.99 in costs, but does not award the NFL attorneys' fees.

## PROCEDURAL BACKGROUND

### The NFL's Complaint

On May 27, 1998, the NFL brought this copyright infringement action against PrimeTime seeking declaratory and injunctive relief, statutory damages, attorneys' fees and costs. (Dkt. No. 1: Compl., Wherefore ¶¶ A–D.) The complaint charged PrimeTime with retransmitting copyrighted NFL football game telecasts to Canada, thus exceeding the statutory license provided for certain U.S. retransmissions by the Satellite Home Viewer Act ("SHVA"). (Compl.¶¶ 1, 9–10, 20–25.) The complaint alleged:

20. Although the [Satellite Home Viewer] Act authorizes delivery of network programming only to "unserved households" in the United States, defendant has repeatedly and willfully transmitted NFL game telecasts to locations outside the country. Specifically, defendant captures the over-the-air broadcast signals in the United States and retransmits the signals to one or more satellites for further retransmission abroad (either directly to satellite dish owners or to cable systems), including in Canada.

21. The League has never granted defendant the right to sell or distribute telecasts of NFL games anywhere outside (or within) the United States.

(Compl.¶¶ 20–21.)

### Judge McKenna's March 24, 1999 Denial of PrimeTime's Motion to Dismiss

On July 24, 1998, PrimeTime moved to dismiss, arguing that " '[t]he Complaint fails to state a claim upon which relief can be granted ... since all the actions complained of take place outside the United States. It is axiomatic that the copyright laws of the United States do not apply extraterritorially.' " *National Football League v. PrimeTime 24 Joint Venture*, 98 Civ. 3778, 1999 WL 163181 at *1 (S.D.N.Y.

Mar.24, 1999) (quoting Dkt. No. 5: PrimeTime 7/24/98 Br. at 1). PrimeTime further argued that " 'its transmissions of the captured signals are not public performances within the meaning of the Copyright Act because .... the final destination of the NFL game signals is outside this country, and since the Act does not apply abroad, [PrimeTime's] transmissions are outside the Act's scope.' " *NFL v. PrimeTime*, 1999 WL 163181 at *2 (quoting Dkt. No. 16: PrimeTime 9/25/98 Reply Br. at 1–2).

On March 24, 1999, Judge McKenna denied PrimeTime's motion to dismiss. Judge McKenna found that the Copyright Act did apply because "PrimeTime's transmission of the signals captured in the United States is 'a step in the process by which a protected work wends its way to its audience,' ... and an infringement, even though it takes one or more further steps for the work to reach the public." *NFL v. PrimeTime*, 1999 WL 163181 at *2 (citation omitted) (quoting *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752, 759 (S.D.N.Y.1988)). Judge McKenna acknowledged that "the Ninth Circuit takes a different view." *NFL v. PrimeTime*, 1999 WL 163181 at *3 (citing *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 387 (9th Cir.1995) ("federal copyright law does not apply to extraterritorial acts of infringement")). Judge McKenna concluded, however, that the "analysis in *David* [is] considerably more persuasive than the Ninth Circuit view." *NFL v. PrimeTime*, 1999 WL 163181 at *3.[1]

### Judge McKenna's September 27, 1999 Grant of Summary Judgment to the NFL and October 18, 1999 Entry of a Permanent Injunction Against PrimeTime

Soon after Judge McKenna's denial of PrimeTime's motion to dismiss, both parties cross-moved for summary judgment. (*See* Dkt. Nos. 20–24: NFL 5/28/99 SJ Papers; Dkt. Nos. 25–29: PrimeTime

---

**1.** Judge McKenna also found that the SHVA prohibits satellite carriers "from capturing signals of network stations in the United States and transmitting them abroad, as PrimeTime is alleged to do." *Id.* at *5.

6/16/99 SJ Papers; Dkt. Nos. 31–34: NFL & PrimeTime SJ Reply Papers.) On September 27, 1999, Judge McKenna denied PrimeTime's motion, granted the NFL's summary judgment motion in its entirety and held that a permanent injunction would be entered against PrimeTime. *National Football League v. PrimeTime 24 Joint Venture*, 98 Civ. 3778, 1999 WL 760130 (S.D.N.Y. Sept.27, 1999).

Judge McKenna found the relevant facts to be undisputed: "PrimeTime does not dispute that NFL is the owner of the copyrights in the telecasts of [the] NFL games" and "PrimeTime does not claim that it is a licensee of NFL." *NFL v. PrimeTime*, 1999 WL 760130 at *1–2. In addition, "PrimeTime has admitted that ... '[it] made secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners located outside the United States' ..., and that 'unless enjoined, [it] intend[s] in the future to make secondary transmissions of U.S. network programming including NFL game telecasts for receipt by dish owners located outside the United States.'" *Id.* (citations omitted, bracketed material in original). Finally, Judge McKenna found that "PrimeTime does not dispute that it caused [certain NFL football] games to be retransmitted to Canada, nor that it causes, and intends to continue to cause, other NFL games of which NFL is the owner of the copyright, to be retransmitted to Canada." *Id.* at *1.

Judge McKenna concluded: "On these undisputed facts and admissions, under the law as the Court found it to be in the March 24, 1999 Order [denying PrimeTime's motion to dismiss], NFL is entitled to summary judgment." *Id.* at *2.[2]

Judge McKenna also held that a permanent injunction should issue:

The Court perceives no reason in the present case to delay the entry of a final injunction. PrimeTime has made it clear that, unless enjoined, it will continue to transmit telecasts of NFL games in which NFL holds the copyright via satellite to Canada, if not to other foreign countries. The presumption that the infringement of a copyright gives rise to irreparable harm has not been rebutted where, as here, an intent to infringe in the future is evident.

*Id.* at *4. After discussing and rejecting PrimeTime's arguments as to the scope of a final injunction, *id.* at *5–6, and finding "no just reason for delay" as required by Fed.R.Civ.P. 54(b), Judge McKenna concluded that:

NFL is entitled to the entry of judgment: (1) declaring that PrimeTime has violated NFL's rights under the Copyright Act by retransmitting NFL game telecasts of which NFL is the owner of the copyright to locations outside the United States; (2) permanently enjoining PrimeTime from making secondary transmissions of NFL game telecasts of which NFL is the owner of the copyright to locations outside of the United States; and (3) referring this case to a Magistrate Judge to calculate such statutory damages and attorneys' fees as NFL may be entitled to.

NFL is to submit a proposed judgment on ten business days' notice to PrimeTime, which may object in writing to the form of the judgment.

*NFL v. PrimeTime*, 1999 WL 760130 at *6.

On October 18, 1999, Judge McKenna entered judgment and an injunction permanently enjoining PrimeTime from making secondary transmissions of copyrighted NFL game telecasts to locations outside the United States. (Dkt. No. 39: Judgment & Permanent Injunction, signed on Oct. 18, 1999 at 11:49 a.m.) Si-

---

**2.** Judge McKenna stated that "[e]ntirely apart from the law of the case doctrine, the Court adheres to the determination expressed in that [March 24, 1999] decision. Nor is the Court persuaded by the new arguments, or variations on old arguments, now advanced by PrimeTime." *Id.*

multaneously, Judge McKenna denied PrimeTime's request for a delay in the injunction's effective date, holding that "PrimeTime's proposal that the final injunction, found by the Court in its September 24, 1999 Memorandum and Order to be warranted, not take effect until October 29, 1999 is not warranted. Prime-Time is to take all steps necessary to comply with the injunction forthwith." *National Football League v. PrimeTime 24 Joint Venture*, 98 Civ. 3778, 1999 WL 945031 at *1 (S.D.N.Y. Oct.19, 1999).

### Second Circuit Appeal

PrimeTime appealed, and the Second Circuit stayed the injunction pending appeal. *National Football League v. Prime-Time 24 Joint Venture*, No. 99–9244 (2d Cir. Nov.16, 1999) (unpublished order granting motion for stay pending appeal and expediting appeal).

On April 28, 2000, the Second Circuit affirmed Judge McKenna's decision. *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir.2000).[3] The Second Circuit held:

> We believe the most logical interpretation of the Copyright Act is to hold that a public performance or display includes "each step in the process by which a protected work wends its way to its audience." *David [v. Showtime/The Movie Channel, Inc.]*, 697 F.Supp. [752] at 759 [ (S.D.N.Y.1988) ]. Under that analysis, it is clear that PrimeTime's uplink transmission of signals captured in the United States is a step in the process by which NFL's protected work wends its way to a public audience. In short, PrimeTime publicly displayed or performed material in which the NFL owns the copyright. Because Prime-Time did not have authorization to make such a public performance, PrimeTime infringed the NFL's copyright.

**3.** PrimeTime's motion for a rehearing or for rehearing *en banc* was denied by the Second Circuit on October 17, 2000. *National Football League v. PrimeTime 24 Joint Venture*, No. 99–9244 (2d Cir. Oct.17, 2000). PrimeTime

*NFL v. PrimeTime*, 211 F.3d at 13. The Second Circuit noted that while the Ninth Circuit's *Allarcom* decision "stated that copyright infringement does not occur until the signal is received by the viewing public," that decision "has been subject to some non-judicial criticism." *Id.* The Second Circuit "accord[ed] the [Ninth Circuit's] decision little weight largely because it contains no analysis of the Copyright Act." *Id.*

### Damages Proceedings in this Court

The parties consented to decision of the remaining issues (damages, attorneys' fees and costs) in this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 64.) I held a bench trial on October 2–3, 2000.

Having considered the evidence and arguments advanced by the parties at trial and in their pre- and post-trial submissions, the following constitute the Court's Findings of Fact and Conclusions of Law, as required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### The Parties

PrimeTime is a satellite carrier that retransmits the signals of United States television networks to owners/renters of satellite television dish antennas in the United States and Canada. (PrimeTime 7/10/00 Br. at 1; *see also* Trial Transcript ["Tr."] at 71–72; Compl. ¶ 6; Answer ¶ 6.)

The NFL is an association composed of thirty member football teams that engage in the business of exhibiting professional football games. (Compl.¶ 5). It is undisputed that the NFL owns the copyright in each of the game telecasts at issue. (Tr. 18–19; Dkt. No. 63: Pretrial Order, Stip. ¶ b.)[4] It is also undisputed that the NFL

filed a petition for certiorari on January 16, 2001 (No. 00–1134), which is pending.

**4.** For example, NFL Senior Vice President Frank Hawkins testified as follows:

"has satisfied each of the prerequisites of 17 U.S.C. § 411(b) for obtaining statutory damages for each of the game telecasts retransmitted by PrimeTime 24." (Pretrial Order, Stip. ¶ e.)

### PrimeTime's Infringing Transmissions to Canada

The parties stipulated as follows regarding PrimeTime's transmissions of NFL games to Canada:

● Between August 31, 1997 and December 31, 1997, PrimeTime made secondary transmissions for receipt by dish owners in Canada (hereafter, "transmissions to Canada") of *59* NFL game telecasts. (Pretrial Order, Stip. ¶ f; Joint Exhibit ("JX") N; Dkt. No. 52: 11/4/99 Stip. ¶ 1.)

● Between August 31, 1998 and December 31, 1998, PrimeTime made transmissions to Canada of *64* NFL game telecasts. (Pretrial Order, Stip. ¶ g; JX O; 11/4/99 Stip. ¶ 2.)

● During September–October 1999, PrimeTime made transmissions to Canada of *18* NFL game telecasts. (Pretrial Order, Stip. ¶ h; JX O.)

> Q: Does each NFL game telecast contain a written copyright notice?
> A: Yes.
> Q: Does it contain a little C symbol, C in a circle?
> A: Yes.
> Q: Does it state that in the telecast?
> A: Yes.
> Q: Does it designate the NFL as the owner of the copyright?
> A: Yes.
> Q: You are also familiar with the verbal copyright warning?
> A: Yes.
> Q: This telecast is presented by the authority of the National Football League, and is intended for the private use of our audience. Any rebroadcast or otherwise of this telecast without the prior written consent of the NFL is prohibited. Isn't that given in each and every NFL game telecast?
> A: Yes.
> (Tr. 18–19.)

5. Specifically, PrimeTime transmitted to Canada portions of one pre-season NFL game on or about August 4, 2000, one pre-season NFL

● Between November 21, 1999 and January 30, 2000, PrimeTime made transmissions to Canada of *33* NFL game telecasts. (Pretrial Order, Stip. ¶ i; JX P; Dkt. No. 57: 5/31/00 2d Stip.)

● In August–September 2000, PrimeTime made transmissions to Canada of all or portions of *6* NFL game telecasts. (Dkt. No. 71: 9/19/00 Supp. Stip. & Order ¶¶ 2–3, 6–7, 10; Tr. 154–56.) [5]

Accordingly, there are *180* infringing PrimeTime transmissions to Canada for which statutory damages must be calculated. (*See also* Tr. 170.)

### Trial Evidence

#### The NFL's Case

The NFL called one witness, Frank Hawkins, NFL Senior Vice President for business affairs, responsible for the NFL's domestic and international television arrangements. (Tr. 15–16.) Hawkins testified that the NFL receives $7.5 million in revenue from granting exclusive licenses in Canada for different NFL game packages to four different television/cable systems.[6] (Tr. 19–21.) According to Hawkins, exclusivity is an important part of the NFL's

game on August 11, portions of one pre-season NFL game on August 14, one pre-season NFL game on August 19, an eight-minute portion of a pre-season NFL game on August 20, and one regular NFL game on September 3, 2000. (Tr. 154–56, 170; 9/19/00 Supp. Stip. & Order ¶¶ 2, 3, 6, 7, 10).

The NFL apparently was not aware of the August 4, 2000 infringement until PrimeTime's witness mentioned it at trial. (Tr. 154.) PrimeTime has not objected to inclusion of this transmission in the damages calculations. (*See* Tr. 170.) The NFL promptly notified PrimeTime immediately after all the other August–September 2000 transmissions. (9/19/00 Supp. Stip. & Order ¶¶ 4–5, 8–9, 11–12.)

6. The NFL's primary telecaster in Canada is the Global Television Network, and it also has arrangements with DSN/RDS, an ESPN-like service, and Rogers Cablevision, as well as a highlight package licensed to Canadian Headline News. (Tr. 19.)

contracts with these Canadian licensees who "are therefore guaranteed they will be the only licensee" of a particular game package. (Tr. 21.) To protect this exclusivity, Hawkins testified that the NFL vigorously litigates against those who broadcast NFL games without a license, such as Canadian bars that show blacked-out game telecasts near a U.S. market city.[7] (Tr. 21–22.) Hawkins testified that PrimeTime's transmissions to Canada interfered with the NFL's marketing strategies, its ability to deliver exclusivity to its licensees and the ability to deliver established and legitimate ratings. (Tr. 29–30, 40, 49–50.) Hawkins, however, could not quantify a particular dollar harm figure. (Tr. 40, 47–49.)

Hawkins testified that when the NFL learned about PrimeTime's activity, it investigated and then communicated with PrimeTime. (Tr. 24–26.) On June 17, 1997, before the 1997 football season, Hawkins wrote to Sid Amira, then-Chairman and CEO of PrimeTime, notifying PrimeTime that it did not have the legal right to transmit NFL game telecasts to Canada and asking PrimeTime to cease doing so. (JX A; see also Tr. 25–26.)

Amira's July 9, 1997 response letter asserted PrimeTime's belief that it had the right to transmit NFL games to Canada under Canadian copyright law. (JX B; see also Tr. 27.) Hawkins responded to Amira by letter dated July 25, 1997, stating:

> None of the facts you recite has any bearing on the legality under United States copyright law of PrimeTime 24's capture within the United States, and its subsequent retransmission and sale abroad, of the copyrighted programming (including NFL game telecasts) included in the U.S. network signals.... PrimeTime 24's interception of our games and sale of those games to any viewers-foreign or domestic-is plainly unlawful under U.S. law, regardless of the status of

PrimeTime 24's activities under other countries' laws.

(JX C.) At trial, Hawkins described this letter as "saying, not in so many words but in effect, 'Your legal theories are all wet.'" (Tr. 27.)

Amira's August 8, 1997 letter response to the NFL expressed PrimeTime's position that "[b]ecause the copyright laws of the United States have no extraterritorial applicability, 'public' performances that occur in other countries cannot trigger liability for copyright infringement under the laws of the United States." (JX D.)

Hawkins testified that he met with Amira in the summer of 1997 and "made it clear to PrimeTime 24 that we did not believe that they had the right to deliver game signals into Canada. They stated that they did. We asked them to cease and desist. They asked us what we were going to be doing about NetLink [another company retransmitting NFL games to Canada—with which the NFL later reached a settlement agreement] and wanted to make sure that we weren't going to be proceeding against [PrimeTime] only, and that was about it." (Tr. 27–28; see also Tr. 22, 42–45.) The NFL commenced this litigation in May 1998. (Tr. 46.)

The NFL also introduced into evidence a series of "Advance Notice of Potential Infringement" letters sent by the NFL's attorneys to PrimeTime from 1997 through 1999, each warning PrimeTime that its transmissions to Canada infringed on the NFL's copyrights and further warning that if the transmissions did not cease, the NFL would take legal action. (JX E–M; see also Tr. 28–29.)

PrimeTime's cross-examination of Hawkins dealt with the "delay" between the NFL's learning of PrimeTime's possible infringement and the NFL's June 1997 first communication with PrimeTime. (Tr. 33–42.) As the Court indicated at trial

---

7. Under the "black out rule," an NFL team's home game may only be telecast in its home market if that game is sold out 72 hours before kickoff. (Tr. 17.)

(*see* Tr. 36–37), since the NFL is not seeking damages for any PrimeTime transmission to Canada before the NFL's June 17, 1997 "cease and desist" letter (JX A), the Court finds that this area of inquiry has no legal relevance.

PrimeTime's cross-examination also established that the NFL cannot quantify its actual damages or PrimeTime's revenues from transmissions of NFL games to Canada. (Tr. 40, 47–50.) PrimeTime's cross-examination also attempted to develop a per subscriber revenue figure for NFL games in Canada (Tr. 50–68), but the Court finds PrimeTime's theory to be factually, analytically and legally unsound. As Hawkins testified, the NFL's Canadian license agreements were not based on actual or estimated future subscriber/viewer data. (Tr. 69.) The NFL's Canadian licensees were granted exclusivity rights that PrimeTime's transmissions violated. (*See* Tr. 21–22, 29–30, 40, 49–50.) Thus, reliance on such a damage theory would reward PrimeTime with the equivalent of a compulsory license that neither Congress nor the NFL was willing to grant. (*See* Tr. 5–6; *see* page 475 below.)

### PrimeTime's Case

PrimeTime called two witnesses, Sid Amira, former Chairman and Chief Executive Officer of PrimeTime, and Susan Weinstein, Senior Vice President and general manager of PrimeTime.[8]

#### Sid Amira

Amira is a non-practicing lawyer who joined PrimeTime as Chairman in October 1995, became CEO in June 1996, and left PrimeTime in late February 1998. (Tr. 70–72.)

Amira testified that he believed PrimeTime's transmissions of NFL games to Canada were legal because, in his view, the U.S. Copyright Act and the Satellite Home Viewer Act did not apply to PrimeTime's transmissions to Canadian viewers. (Tr. 72–73.) Amira testified that his opinion was "substantiated" by the fact that a PrimeTime competitor, NetLink, also was transmitting NFL games to Canada. (Tr. 75–76.) Amira testified that he consulted Brandon White of the Washington, D.C. law firm of Foley, Hoag & Eliot, who orally advised PrimeTime that "the U.S. law did not pertain, and that [PrimeTime's] distributing product in Canada was legal under Canadian law." (Tr. 74–75.)[9] The Court found Amira (and Weinstein) to be evasive when testifying about the legal advice on which PrimeTime relied. The Court also finds it noteworthy that there apparently is no written advice of counsel to PrimeTime, or at least none introduced into evidence. (*See* Tr. 14, 75.) Amira testified to the absence of any written opinion from PrimeTime's counsel:

> THE COURT: ... Was that opinion of counsel expressed orally, in writing, or both?
>
> THE WITNESS [Amira]: Orally, and then in writing when we communicated to the other [*i.e.*, to the NFL].
>
> THE COURT: Is there any writing from Mr. White where his firm or any other U.S. lawyer [wrote] to you as op-

---

8. PrimeTime also moved to admit portions of the deposition testimony of Douglas Skinner, a Canadian satellite distributor, to support its proposition that PrimeTime did not substantially benefit from offering NFL telecasts to Canadian viewers. (*See* Dkt. No. 63: Pretrial Order at 5; Tr. 165–68.) The NFL objected, arguing that Skinner's testimony should be precluded by the principle of judicial estoppel as inconsistent with PrimeTime's position before the Second Circuit that PrimeTime will be irreparably harmed should its transmissions to Canada be prohibited. (Tr. 165; Pretrial Order at 7.) After reviewing the designated Skinner deposition testimony, the Court concludes that his testimony is irrelevant to the Court's damages analysis and the Court therefore need not rule on whether his testimony is barred by judicial estoppel.

9. PrimeTime waived the attorney-client privilege and allowed full discovery on the advice of counsel issue. (Tr. 14.)

The NFL did not object to Mr. White's role as trial counsel despite testimony and colloquy as to his advice to PrimeTime. The Court therefore does not examine any ethical issues that may be raised by Mr. White's dual role.

posed to the drafting of the letters that were sent to the NFL?

THE WITNESS: Not to my recollection, no.

(Tr. 75.) [10]

When Amira received the NFL's June 17, 1997 cease and desist letter (JX A), he discussed it with counsel, and then Amira and counsel Brandon White wrote Prime-Time's July 9, 1997 response letter, JX B. (Tr. 77.) Amira testified:

Q: How did the contents of this letter that you wrote, tab B [JX B], how did the contents of that letter compare to the advice I gave you on the legality of PrimeTime 24's retransmissions to ... Canada?

A: It was exactly the same position. This was written by both of us, who strongly believed we were doing everything legal in Canada.

(Tr. 77.) Amira received the NFL's response (JX C) and Amira responded with JX D, which was "totally in concert with the advice [counsel] gave [PrimeTime]." (Tr. 78.) Amira met with Hawkins and thereafter received several letters reserving the NFL's right to sue. (Tr. 79–81, 83–89.) PrimeTime did not change its practices as a result of the NFL's objections. (Tr. 78, 82, 89.) The NFL did not take any further action against PrimeTime before Amira left PrimeTime in February 1998. (Tr. 81.)

The Court asked Amira whether he and PrimeTime's counsel gave "any consideration to filing a declaratory judgment action either within the Ninth Circuit or elsewhere?" and Amira responded that to the best of his recollection, they did not discuss that. (Tr. 78; *see also* Tr. 117.)

According to Amira, PrimeTime did not cease its NFL game transmissions after the NFL's cease and desist and notice of infringement letters because PrimeTime "strongly believed, partially on the advice of counsel, that we were doing everything legally." (Tr. 89.) Regarding the legal risk involved in transmitting copyrighted NFL games to Canada, Amira testified as follows:

Q: The reason you gave or one of the reasons you gave for PrimeTime 24 refusing to heed these warnings [by the NFL urging PrimeTime to cease its Canadian transmissions], is the advice you received from counsel that PrimeTime 24 wasn't doing anything illegal, correct?

A: Yes.

Q: And that advice came from, among others, Mr. [Brandon] White and the law firm of Foley, Hoag & Eliot, correct?

A: Yes.

Q: Mr. White did not tell you ... there was no risk in continuing to show NFL game telecasts, correct?

A: I believe *he explained the risk to us* and, you know, as most attorneys do, they would [not] say there is no risk, they are very careful as to their communications, telling all sides, but the strong communication is that we were doing everything legally.

Q: But there was a risk and you chose to take it, correct?

A: ... *I mean there is a risk in doing this, yes,* but we didn't think we were taking any large risk because, No. 1, how small this was in the context of our entire business, and No. 2, we thought we were doing everything legally.

...

*[T]here is a risk in almost everything you do. We weighed the risk, didn't think it was large.*

---

**10.** PrimeTime's counsel Mr. White informed the Court that "in fact our office did write something and it did go to PrimeTime 24 and it's been introduced [sic; produced—?] in discovery [but it] was not something Mr. Amira could first-hand recall and speak of, so I haven't put it in front of him." (Tr. 75.) Nor was it or any similar document introduced into evidence at trial.

(Tr. 89–90, emphasis added.) As noted above, the Court finds Amira's testimony on the risk question to be evasive, and finds the absence of direct testimony or representation from PrimeTime's counsel as to its advice regarding the level of risk that PrimeTime was incurring to be telling against PrimeTime.

### Susan Weinstein

PrimeTime's second witness was Susan Weinstein, PrimeTime's Senior Vice President and general manager, who joined PrimeTime in February 1998, and became "responsible basically for the whole Prime-Time business as to financial [and] operations" in Fall 1999. (Tr. 106, 108, 109.) Regarding her knowledge of PrimeTime's position as to the NFL's infringement claims, Weinstein testified:

Q: .... [C]ould you tell us what was the reaction that you had when you became aware of the National Football League's position [about PrimeTime's transmission of NFL games to Canada]?

A: Well, I asked—started doing a little bit of research. I agreed with what the conventional wisdom was, that PrimeTime 24's wisdom was that we had the right to distribute those networks for a variety of reasons.

Q: ... What do you mean [by] the conventional wisdom?

A: Well, SHVA, [The] Satellite Home Viewer Act, only has jurisdiction in the United States, and so we were not violating that [statute] because [the issue concerned] business in Canada.

I went to the distributor contracts and saw that every single one of our distributor[s] ... was obligated to pay copyright to the Canadian copyright tribunal, and I also knew Primetime 24 had been in this business for many years.

I read the letters that came from Sid [Amira], I actually called Sid at home to ask him about them, and he said he had directed them [with] Brandon [White], and they made a lot of sense to me. And in addition, our only competitors

... also had a business in Canada, and that did not seem to be a problem for the NFL, at all.

(Tr. 112–13.)

Weinstein testified that PrimeTime did not respond to the NFL's cease and desist letters "because we believed that we had the right to deliver the games and we knew they had a difference of opinion." (Tr. 117.)

Weinstein testified about PrimeTime's conduct during the course of this litigation. She testified that PrimeTime "proceeded with business as usual," *i.e.*, continued to transmit NFL games to Canada, after Judge McKenna's denial of PrimeTime's motion to dismiss because

it wasn't a ruling that said we were doing anything wrong. It was just a ruling that said that this charge—it was not going to be dismissed, so *we proceeded with business as usual,* and in [fact], I believe that in that ruling, the judge even cited other courts that had differences of opinion with him.

(Tr. 118, emphasis added; *see also* Tr. 141.) PrimeTime's lawyers advised PrimeTime that in light of Judge McKenna's decision denying the motion to dismiss, "it was a possibility and there was a chance" that he would grant summary judgment for the NFL. (Tr. 143.) Weinstein was unable to recall, however, whether counsel advised PrimeTime that the "possibility" was remote or likely:

Q: And Primetime 24 was aware that given the Court's ruling on the motion to dismiss, it was likely to grant the NFL's motion for summary judgment, correct?

A: I wouldn't guess that. I would never guess what a judge is going to do.

Q: *Your lawyers didn't tell you in light of Judge McKenna's ruling on the motion to dismiss that it was likely that summary judgment was going to be granted?*

A: *They told me it was a possibility and there was a chance it could happen. They always tell me you never know*

*what's going to happen until you get there.*

. . . .

THE COURT: Was what Mr. White and the other lawyers told you, that it was a possibility, in the sense of something remote or that it was a possibility in the sense of being more likely than not, but not guaranteed?

THE WITNESS: *I think it was a possibility. I don't remember if they said it was* ⁵⁰⁄₅₀*, 70/30. I don't remember exactly, but, yes, it was a possibility.*

Q: A substantial possibility, correct?

A: I don't recall anybody using that word.

Q: *What words were used?*

A: *I don't recall the conversation.* I mean, frankly, I was busy running the [business] and we have a staff of attorneys that were responding to motions.

(Tr. 143–44, emphasis added.) The Court finds Weinstein's testimony in this regard to be both evasive and further evidence that PrimeTime chose to ignore the effect of Judge McKenna's decision denying the motion to dismiss.

On September 27, 1999, Judge McKenna granted the NFL's summary judgment motion. *National Football League v. Primetime 24 Joint Venture,* 98 Civ. 3778, 1999 WL 760130 (S.D.N.Y. Sept.27, 1999). Only after that decision, Weinstein testified, did she begin "working very, very hard to come up with a system for effecting the blackouts." (Tr. 119.)

It is significant that PrimeTime continued with "business as usual" after Judge McKenna's decision denying PrimeTime's motion to dismiss, and further significant that Weinstein only began to *"come up with"* a system to black-out Canadian transmissions after Judge McKenna's summary judgment decision. (Tr. 119, 144.) Notably absent is any testimony regarding preparation, or even consideration of preparation, for black-outs before this time. Weinstein testified that:

Q: [Your lawyers] told you [on or about September 24, 1999 that Judge McKenna granted the NFL's motion for summary judgment and] . . . that Judge McKenna was going to enter an injunction against PrimeTime 24, correct?

A: I believe so, yes.

Q: And they told you that any injunction entered by the Court would prohibit Primetime 24 from showing NFL game telecast in Canada, correct?

A: Yes.

Q: Now Primetime 24 continued to retransmit NFL game telecast into Canada until Judge McKenna entered the formal injunction on October 18, 1999, correct?

A: Yes.

. . .

Q: PrimeTime 24 made a business decision that it was not going to implement—*PrimeTime 24 made a business decision that [it] was not going to implement blackouts until formally ordered by Judge McKenna, correct?*

A: *I believe that's correct.*

. . . .

Q: I would like to refer you to page 127 of your deposition. . . . The question is:

> "Q. PrimeTime 24 at no point considered implementing the blackout of telecasts prior to the time it was ordered to do so by the Court prior to October 19, 1999; is that correct?" What was your answer, Ms. Weinstein?

A: "That's correct."

. . . .

Q: *[Y]ou had made the business decision that until a formal injunction was entered, you weren't going to implement the blackouts?*

A: I didn't make the decision.

Q: PrimeTime 24 made that decision?

A: *The decision was made, yes.*

Q: Even though at this time Prime-time 24 had been told by a Federal Court that its actions constituted infringement and it would be ordered to stop as soon as the Court could enter a precise form of injunction, correct?

A: Yes, I guess.

(Tr. 145–48, emphasis added.) Weinstein's testimony reveals that PrimeTime consciously and deliberately disregarded the Court's decisions until a formal injunction was entered. During the period after the motion to dismiss was denied and after the summary judgment decision finding infringement and indicating that an injunction would be entered but before the formal injunction order, PrimeTime transmitted 18 NFL football games to Canada. (Pretrial Order, Stip. ¶ h.)

After the October 18, 1999 injunction was entered, PrimeTime implemented its blackout. (Tr. 148.) However, because PrimeTime had not timely started preparations for the blackout, Weinstein "wasn't comfortable" and "felt we weren't ready. It wasn't tested. We were trying something new." (Tr. 137.) She also discovered that it was "much more complex than [she had] thought it would be." (Tr. 144; see also Tr. 164.)

On November 11, 1999, less than a month after the injunction was entered, the Second Circuit stayed the injunction pending an expedited appeal. (Tr. 148.) See National Football League v. Prime-Time 24 Joint Venture, No. 99–9244 (2d Cir. Nov.16, 1999) (unpublished order staying injunction and expediting appeal). During the period after the stay but before the Second Circuit affirmed the injunction on April 28, 2000, National Football League v. PrimeTime 24 Joint Venture, 211 F.3d 10 (2d Cir.2000), PrimeTime transmitted 33 NFL football games to Canada. (Pretrial Order, Stip. ¶ i.)

Weinstein testified that PrimeTime recognized that there was a risk in transmitting NFL games to Canada while the appeal was pending before the Second Circuit:

Q: ... Did Primetime 24 understand that there was a risk when it showed the games after the Second Circuit lifted the stay?

A: I'm sure we understood there was a risk.

Q: And Primetime 24 elected to take this risk, correct?

A: We elected to continue showing the games once the Court said the injunction was lifted.

Q: In fact, Primetime 24 showed every NFL game telecast available from the moment the injunction was stayed until the Rams beat the Titans in the Superbowl in January of 2000, correct?

. . . .

A. ... Yes.

(Tr. 149–50, emphasis added.)

After the Second Circuit's April 28, 2000 decision upholding the injunction, Weinstein testified that PrimeTime intended at all times to comply with the injunction and that PrimeTime "blacked out the games." (Tr. 121, 124.) Weinstein admitted, however, that on six separate occasions in August–September 2000, PrimeTime transmitted to Canada all or parts of NFL games because of equipment or personnel failures or inadvertent technical errors. (Tr. 124–27; see page 464 n. 5 above.) Weinstein testified that PrimeTime "double and triple check[s]" things now to prevent human error and that PrimeTime has a staff member in communication with the satellite uplink facility during game telecasts so that they can black out the game in all of North America if the equipment being used to black-out just Canada develops problems. (Tr. 125–26, 128, 156–57.)

**PrimeTime's Reliance on Advice of Counsel Defense Without Calling Counsel to Testify**

Despite PrimeTime's insistence that it reasonably relied on the advice of counsel, PrimeTime failed to call any of its attorneys as witnesses or to produce even one internal memorandum or letter from

PrimeTime's counsel to PrimeTime disclosing counsel's legal advice, and particularly counsel's advice as to the risks in PrimeTime's actions at various stages of this litigation.

PrimeTime also failed to produce the person(s) at PrimeTime responsible for deciding to transmit NFL games (and other programs) to Canada after Amira left PrimeTime in February 1998. Although Weinstein is responsible for "the whole PrimeTime business as to financial operations" (Tr. 108–09), she conceded that her knowledge about PrimeTime's decision-making process concerning transmission to Canada was limited, and that the risk-weighing involved in choosing to continue to transmit NFL games (and other copyrighted broadcasts) to Canada was done by others:

> THE COURT: Have you had any discussions with any of the four [United States] networks, ABC, CBS, NBC or Fox after the Second Circuit decision with respect to their views about your activities?
>
> THE WITNESS [Weinstein]: No, I have not. I don't know.
>
> THE COURT: Do you know if anyone at PrimeTime 24 has?
>
> THE WITNESS: I don't know if anybody has.
>
> . . .
>
> THE COURT: . . . In what sense did [your lawyers] tell you or did you take from their discussion the level of risk they were telling you with respect to continuing to broadcast [copyrighted

broadcasts from] the four [U.S.] networks into Canada in light of the Second Circuit decision?

> THE WITNESS: You know, to be perfectly honest, your Honor, in my company, *I'm not the person making that decision.* I've had discussions with my attorneys about it. I *never really asked them, well, what do you think, how risky it is on the scale because that decision is out of my hands.* We have had a discussion.
>
> THE COURT: Meaning your president or CEO or somebody makes that decision?
>
> THE WITNESS: The decision is made above me, yes.

(Tr. 159–60, emphasis added.) [11]

The Court finds that, for a company whose entire argument for minimal damages as an innocent infringer depends on its reliance on the advice of counsel, PrimeTime has failed to present adequate and convincing evidence to support its position.

## CONCLUSIONS OF LAW

### I. STATUTORY DAMAGES: LEGAL STANDARDS AND THE PARTIES' POSITIONS

#### A. Applicable Legal Standards

■ The owner of a registered copyright that has been infringed can elect to recover either actual damages or statutory damages. 17 U.S.C. §§ 504(a)(1)-(2), 504(c). The NFL does not seek actual

---

11. While Weinstein was not aware of whether PrimeTime had discussions with the four U.S. television networks, or PrimeTime's legal risk in continuing to transmit network programs to Canada after the various rulings in this case, it is clear that PrimeTime was aware of the networks' position. On or about December 30, 1999—long before Weinstein's trial testimony—ABC, CBS, Fox and NBC filed an amicus brief in the Second Circuit supporting the NFL's legal position. The other major sports leagues (baseball, basketball and hockey) and the Motion Picture Association of America filed an additional amicus brief in the Second Circuit in December 1999 supporting the NFL's position. This sheds further light on PrimeTime's conduct—while Judge McKenna's injunction does not enjoin PrimeTime from transmitting to Canada the programs of the other networks and other sports leagues, the logic of his decisions (and the Second Circuit's affirmance) applies equally to the networks and other sports leagues. But in spite of PrimeTime's awareness of the networks' and other sports leagues' position, PrimeTime has continued to transmit to Canada their programs.

damages in this case, but rather asks that the Court award statutory damages. (*See* Pretrial Order ¶ iv; *see generally* NFL 7/10/00 Br.)

■ Statutory damages "are available without proof of plaintiff's actual damages or proof of any damages." *Starbucks Corp. v. Morgan*, 99 Civ. 1404, 2000 WL 949665 at *2 (S.D.N.Y. July 11, 2000) (Peck, M.J.) (citing 17 U.S.C. § 504(c)(1); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04 (1999 ed.); 2 William F. Patry, *Copyright Law & Practice* at 1170 (1994)); *see* page 478 n. 17 below. As Professor Patry has explained:

> Since actual damages and profits frequently are difficult to prove, the Copyright Act provides for minimum and maximum statutory damages. These damages may be elected by the copyright owner at any time before final judgment is rendered, without proof of actual damages.

2 William F. Patry, *Copyright Law & Practice* at 1170 (fns. omitted).

The Copyright Act's provision for statutory damages is found in 17 U.S.C. § 504(c), which at the time of PrimeTime's infringements provided as follows:

> (c)(1) [T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work,[12] for which any one infringer is liable individually, ... in a sum of not less than $500 or more than $20,000 as the court considers just....

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, *that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000.* In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court i[n] its discretion may reduce the award of statutory damages to a sum of not less than $200....

17 U.S.C. § 504(c)(1)-(2) (1999) (emphasis added).[13]

■ It is well-established that district courts have broad discretion in setting the amount of statutory damages within the minimum and maximum amounts prescribed by the Copyright Act. *See, e.g., Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345–46, 118 S.Ct. 1279, 1283, 140 L.Ed.2d 438 (1998) (" 'the court in its discretion' may, within limits, increase or decrease the amount of the statutory damages"); *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 231–33, 73 S.Ct. 222, 224–25, 97 L.Ed. 276 (1952); *DC Comics Inc. v. Mini Gift Shop*, 912 F.2d 29, 34 (2d Cir.1990) (" 'Within these [statutory maxima and minima] limitations the [district] Court's discretion and sense of justice are controlling ...' "); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1116 (2d Cir.1986) (referring to "the wide discretion the Copyright Act affords the trial court in setting the amount of statutory damages"); 4 Melville

---

**12.** Statutory damages are to be assessed "for all infringements ... with respect to any one work," 17 U.S.C. § 504(c)(1), that is, *per work* not *per infringement*. Here, each NFL game telecast is a separate copyrighted work. Accordingly, the Court's reference to "infringements" in the context of calculating damages is merely shorthand.

**13.** The 1999 amendments to the Copyright Act increased the statutory damage range under § 504(c)(1) to between $750 and $30,000

and increased the maximum amount for willfull infringements under § 504(c)(2) to $150,000. In increasing these amounts, Congress provided that the increased amounts "shall apply to any action brought on or after the date of the enactment of this Act [Dec. 9, 1999] ..." 17 U.S.C. § 504(c), Notes, "Effective and Applicability Provisions." The NFL does not seek damages under the 1999 amendments. (NFL 7/10/00 Br. at 6.)

B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][1][a] at 14–51 to 14–54; 2 William F. Patry, *Copyright Law & Practice* at 1172 ("The amount to be awarded is within the district court's discretion; so long as the award is within the statutory maxima and minima, it is not reversible.").[14]

"'The broad discretionary power given courts to make such an award serves the dual purposes of the Copyright Act: to compensate copyright owners and to provide a deterrent for would-be infringers.'" *Schwartz–Liebman Textiles v. Last Exit Corp.*, 815 F.Supp. at 108 (quoting *Lauratex Textile Corp. v. Allton Knitting Mills*, 519 F.Supp. 730, 733 (S.D.N.Y.1981)); *see also, e.g., F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. at 233, 73 S.Ct. at 225; 2 William F. Patry, *Copyright Law & Practice* at 1172 ("The purpose of statutory damages is not only the restitution of the defendant's ill-gotten profits, but also to discourage wrongful conduct by imposing a high enough penalty so that defendants will realize that it is less expensive to comply with the law than to violate it.").

Courts have recognized that "any attempt to reduce this determination [of statutory damages] to some kind of mathematical formula or equation is spurious." *UMG Recordings, Inc. v. MP3.Com, Inc.*, 00 Civ. 472, 2000 WL 1262568 at *5 (S.D.N.Y. Sept.6, 2000); *see also, e.g., F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. at 232, 73 S.Ct. at 225 ("Few bodies of law would be more difficult to reduce to a

short and simple formula than that which determines the measure of damage recoverable for actionable wrongs. The necessary flexibility to do justice in the variety of situations which copyright cases present can be achieved only by exercise of the wide judicial discretion within limited amounts conferred by this statute" as to statutory damages.); *Eastern America Trio Prods., Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 419 (S.D.N.Y.2000) ("the statute does not afford much guidance as to how courts are to fix appropriate amounts in statutory damages cases"); *United States Media Corp. v. Edde Entm't Corp.*, 94 Civ. 4849, 1998 WL 401532 at *19, *21 (S.D.N.Y. July 17, 1998) ("As for the amount of a statutory award, application of the relevant factors gives us some guidance, although the ultimate decision is unavoidably arbitrary to a degree.... [and] we lack any ready formula for determining a statutory award.").

■ The case law teaches that courts may consider a number of factors in awarding statutory damages. As one copyright law treatise has summarized:

> In awarding statutory damages, the courts may consider, among other factors, the expenses saved and the profits earned by the defendant, the revenues lost by the plaintiff, the deterrent effect on the defendant and third parties, the defendant's cooperation in providing evidence concerning the value of the in-

14. *See also, e.g., Yurman Design, Inc. v. PAJ, Inc.*, 93 F.Supp.2d 449, 462 (S.D.N.Y.2000) (the trial court has broad discretion "between these two extremes" delineated by the statute); *Lyons Partnership, L.P. v. AAA Entm't Inc.*, 98 Civ. 0475, 1999 WL 1095608 at *7 (S.D.N.Y. Dec.3, 1999) ("Under the Copyright Act, the court has broad discretion in setting statutory damages."); *NFL v. White*, No. 96–CV–0533, 1997 WL 736665 at *1 (W.D.N.Y. Nov.19, 1997) ("This Court has broad discretion in determining the amount of statutory damages that the plaintiffs should be awarded."); *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.*, 919 F.Supp. 656, 659 (S.D.N.Y. 1996); *Antenna Television, A.E. v. Aegean Vid-*

*eo Inc.*, No. 95–CV–2328, 1996 WL 298252 at *10 (E.D.N.Y. Apr. 23, 1996); *Gladys Music v. Ed Smith Prods., Ltd.*, No. 94–CV–429, 1994 WL 705265 at *3 (N.D.N.Y. Dec. 6, 1994) (Pooler, D.J.); *Wenaha Music Co. v. Irish Wheel, Inc.*, No. 94–CV–0165, 1994 WL 661028 at *1 (W.D.N.Y. Nov.16, 1994); *Schwartz–Liebman Textiles v. Last Exit Corp.*, 815 F.Supp. 106, 108 (S.D.N.Y.1992); *Dumas v. Dagl*, 88 Civ. 2293, 1990 WL 258343 at *4 (S.D.N.Y. May 22, 1990) (The court's "discretion on this subject is anything but narrow. Indeed, the court's 'discretion and sense of justice are controlling' subject only to the specific statutory limits.").

fringing material, and the conduct and attitude of the parties.

2 William F. Patry, *Copyright Law & Practice* at 1172–73 (fns. citing cases omitted); *see also, e.g., N.A.S. Import, Corp. v. Chenson Enter., Inc.,* 968 F.2d 250, 252–53 (2d Cir.1992); *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d at 1117 ("in deciding upon the appropriate statutory damages award" a court may consider "the expenses saved and the profits reaped by the infringers," "revenues lost by the plaintiff," the defendant's culpability and "the deterrent effect on others besides the defendant"); *Eastern America Trio Prods., Inc. v. Tang Elec. Corp.,* 97 F.Supp.2d at 419 ("earlier cases instruct that a court may consider the defendant's intent, the need to deter future violations, and the economic benefits and detriments to the plaintiff and defendant when determining [statutory] damage amounts"); *Time Warner Cable v. Googies Luncheonette, Inc.,* 77 F.Supp.2d 485, 490 (S.D.N.Y. 1999) (to determine statutory damages for willfull infringements, the court "fully compensated" the plaintiff for any loss it suffered and "divest[ed] the defendants of any profits" so that defendants "reap no benefit from unlawful action"); *Infinity Broadcasting Corp. v. Kirkwood,* 63 F.Supp.2d 420, 427 & n. 35 (S.D.N.Y.1999); *Arthur A. Kaplan Co. v. Panaria Int'l Inc.,* 96 Civ. 7973, 1998 WL 603225 at *3, 48 U.S.P.Q.2d 1315, 1317 (S.D.N.Y.1998); *Odegard, Inc. v. Costikyan Classic Carpets, Inc.,* 963 F.Supp. 1328, 1340 (S.D.N.Y.1997) (" 'Relevant factors in determining the amount of statutory damages include the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of the defendant's conduct and the infringers' state of mind.' "); *Gladys Music v. Ed Smith Prods., Ltd.,* 1994 WL 705265 at *3.

Obviously, a key factor in determining the appropriate statutory damage award is " 'the infringers' state of mind—whether willfull, knowing or merely innocent.' "

*N.A.S. Import, Corp. v. Chenson Enter., Inc.,* 968 F.2d at 252 (quoting 3 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B] at 14–41). The legal standards as to willfull or innocent infringement are discussed in Point II below.

### B. *The Parties' Positions*

#### 1. *The NFL*

The NFL argues that all of PrimeTime's infringements were "flagrant" and "willfull." (NFL 7/10/00 Br. at 2, 10.) Nonetheless, the NFL seeks different statutory damage amounts based on the stage in the litigation at which the infringing transmissions occurred.

For PrimeTime's transmission to Canada of 59 NFL games in 1997 and 64 NFL games in 1998—before Judge McKenna's March 1999 decision denying PrimeTime's motion to dismiss—the NFL seeks statutory damages of $10,000 per game, for a total of $1,230,000. (NFL 7/10/00 Br. at 11.)

For PrimeTime's 18 infringements in September–October 1999—after Judge McKenna's decision on the motion to dismiss and, for 12 of the 18, also after his decision granting the NFL summary judgment, but before the formal injunction was entered—the NFL seeks the maximum willfullness statutory damages of $100,000 per game, for a total of $1,800,000. (NFL 7/10/00 Br. at 11–12.)

For PrimeTime's 33 infringements between November 21, 1999 and January 30, 2000—after the Second Circuit stayed the injunction and before it upheld Judge McKenna's decision—the NFL seeks statutory damages of $10,000 per game, for a total of $330,000. (NFL 7/10/00 Br. at 12.)

Finally, for PrimeTime's 6 infringements in August–September 2000—after the Second Circuit's April 2000 decision affirming Judge McKenna's injunction ruling—the NFL contends that PrimeTime's efforts to comply with the injunction were "woefully inadequate," PrimeTime should be found

in contempt, and the NFL seeks willfull-ness statutory damages of $100,000 per infringement, for a total of $600,000. (Tr. 7–8, 170–71.)

Thus, the NFL seeks $1,230,000 for the 123 infringements in 1997 and 1998, $1,800,000 for the 18 infringements in Sep-tember–October 1999, $330,000 for the 33 infringements in November 1999–January 2000, and $600,000 for the six infringe-ments in August–September 2000, for a total of $3,960,000 in statutory damages.

### 2. *PrimeTime*

PrimeTime's position is that "at all times relevant to this dispute, PrimeTime 24 rea-sonably believed, in part based on the ad-vice of its counsel, that its retransmission of [NFL] games to Canada did *not* in-fringe the NFL's copyrights under the United States Copyright Act." (PrimeTime 7/10/00 Br. at 2, emphasis in original.) PrimeTime argues that its infringements not only were not willfull but were inno-cent, and asks that the NFL be awarded the minimum, innocent infringer statutory amount of $200 per transmission. (*Id.* at 10, 13, 14.) PrimeTime argues that a "minimal damages award is also appropri-ate because the NFL has suffered little, if any, actual harm and PrimeTime 24 has enjoyed no substantial profit from its re-transmission of NFL games to Canada." (*Id.* at 1.) PrimeTime computes "the hypo-thetical cost of a license to PrimeTime 24 on a per game basis" to be $201 (*id.* at 13), not-so-coincidentally almost the same as the $200 innocent infringer minimal statu-tory damage amount.

Thus, PrimeTime's position is that its liability is limited to $200 times 180 trans-missions, for a total of $36,000.

### II. *STATUTORY DAMAGES: ANALY-SIS*

The initial issue in assessing statutory damages is whether PrimeTime's infringe-ment was "willfull," justifying an enhanced statutory damage award up to $100,000, or whether it was "innocent," justifying a re-duced award of as little as $200 per in-fringement. *See, e.g., Arthur A. Kaplan Co. v. Panaria Int'l Inc.*, 96 Civ. 7973, 1998 WL 603225 at \*3, 48 U.S.P.Q.2d 1315, 1317 (S.D.N.Y. Sept.11, 1998) ("The initial determination to be made in assessing statutory damages is whether the infringe-ment was willfull."); *United States Media Corp. v. Edde Entm't Corp.*, 94 Civ. 4849, 1998 WL 401532 at \*18 (S.D.N.Y. July 17, 1998) ("Because the amount of statutory damages may be substantially affected by whether the defendant acted willfully, we first address that question."); *Gladys Mu-sic v. Ed Smith Prods., Ltd.*, No. 94–CV–429, 1994 WL 705265 at \*4 (N.D.N.Y. Dec. 6, 1994) (Pooler, D.J.) ("The most critical factor under consideration is the element of willfull infringement."); *Dumas v. Dagl*, 88 Civ. 2293, 1990 WL 258343 at \*4 (S.D.N.Y. May 22, 1990) ("The initial de-termination to be made in assessing statu-tory damages is whether the defendants' infringement of plaintiffs' copyright was 'willfull' within the meaning of § 504(c)(2) of the Copyright Act.").

■ " '[W]illfullness' in the context of statutory damages for copyright infringe-ment means that the infringer either had actual knowledge that it was infringing the plaintiffs' copyrights or else acted in reck-less disregard of the high probability that it was infringing plaintiffs' copyrights." *UMG Recordings, Inc. v. MP3.Com. Inc.*, 00 Civ. 472, 2000 WL 1262568 at \*4 (S.D.N.Y. Sept.6, 2000); *see, e.g., Hamil America, Inc. v. GFI*, 193 F.3d 92, 97 (2d Cir.1999) (" 'The standard is simply wheth-er the defendant had knowledge that its conduct represented infringement or per-haps recklessly disregarded the possibili-ty.' "); *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010–11 (2d Cir.1995) (" 'Reckless disregard of the copyright holder's rights ... suffices to warrant award of the enhanced damages.' "); *N.A.S. Import, Corp. v.. Chenson Enter., Inc.*, 968 F.2d 250, 252 (2d Cir.1992); *Fitz-gerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir.1986); *Antenna Television, A.E. v. Aegean Video Inc.*, No.

95–CV–2328, 1996 WL 298252 at *10 (E.D.N.Y. Apr. 23, 1996); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][3] (1999 ed.); 2 William F. Patry, *Copyright Law & Practice* at 1173–74 (1994).[15]

Before the Court examines whether PrimeTime's infringements were willfull, the Court will first deal with PrimeTime's assertion that all of its infringements were "innocent."

## A. *PrimeTime's Infringements Were Not "Innocent"*

Under Section 504(c)(2), the Court may reduce statutory damages to as low as $200 per infringement where the "infringer sustains the burden of proving ... that such infringer was not aware and had no reason to believe that [its] acts constituted an infringement of copyright." 17 U.S.C. § 504(c)(2).

PrimeTime argues that it reasonably believed that its transmissions of NFL games to Canada did not violate the United States Copyright Act, due to the advice of counsel and its reliance on the Ninth Circuit's *Allarcom* decision. (PrimeTime 7/10/00 Br. at 2.) Consequently, PrimeTime asserts that the NFL is entitled only to the minimum damages of $200 per game (*id.* at 10, 13, 14), reserved by statute for "innocent infringers."

■ "Innocent" intent, however, is more than just the absence of willfullness. As the Second Circuit has explained:

It is plain that "willfully" infringing and "innocent intent" are not the converse of one another. Thus, it is possible in the same action for a plaintiff not to be able to prove a defendant's willfullness, and, at the same time, for the defendant to be unable to show that it acted innocently.

*Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir.1986); *see also,*

e.g., *Eastern America Trio Prods., Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 419 (S.D.N.Y.2000) (an innocent infringer must "prove that it was not aware and had no reason to believe that his or her acts constituted infringement"); *Arthur A. Kaplan Co. v. Panaria Int'l, Inc.*, 96 Civ. 7973, 1998 WL 603225 at *4, 48 U.S.P.Q.2d 1315, 1318 (S.D.N.Y. Sept.11, 1998); *JBJ Fabrics Inc. v. India Garments, Inc.*, 92 Civ. 8324, 1994 WL 4443 at *1 (S.D.N.Y. Jan.4, 1994) ("A failure of a plaintiff in a copyright infringement action to prove willfull infringement does not mean that the defendant has sustained the burden imposed by 17 U.S.C. § 504(c)(2)(second sentence): 17 U.S.C. § 504(c) rather plainly contemplates a middle ground in the statutory damage scheme when neither plaintiff nor defendant has sustained the burden of showing, respectively, willfull or innocent infringement."); 4 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* §§ 13.08, 14.04[B][2]-[3] (" 'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement. Otherwise, there would be no point in providing specially for the reduction of minimum awards in the case of innocent infringement because any infringement that was nonwillfull would necessarily be innocent.") (fns. omitted).

Indeed, a defendant's burden of proving innocent infringement has been described by one commentator as "a heavy one." 2 William F. Patry, *Copyright Law & Practice* at 1175 (1994); *see also, e.g., D.C. Comics Inc. v. Mini Gift Shop*, 912 F.2d 29, 35 (2d Cir.1990) ("The burden is on the defendants to establish that any infringement was innocent.... [I]t is not sufficient for a defendant merely to claim such innocence ....").

"Even for an innocent defendant, the court may still choose to award damages up to the [statutory] maximum amount." 4 Melville B. Nimmer & David Nimmer,

---

**15.** *See also, e.g., Leon B. Rosenblatt Textiles, Ltd. v. Griseto*, 96 Civ. 2925, 1999 WL 739532 at *5 (S.D.N.Y. Sept.22, 1999); *Arthur A. Kaplan Co. v. Panaria Int'l Inc.*, 1998 WL 603225 at *3, 48 U.S.P.Q.2d at 1317; *Peer Int'l Corp.*

*v. Luna Records, Inc.*, 887 F.Supp. 560, 568 (S.D.N.Y.1995) (Sotomayor, D.J.); *Dumas v. Dagl*, 1990 WL 258343 at *4 ("Proof of actual knowledge or maliciousness is not required, and constructive knowledge is enough.").

*Nimmer on Copyright* § 14.04[B][2][a] at 14–56 n. 46; *see also id.* § 1308 at 13–281 n. 9.1.

■ PrimeTime has not met its burden. In its post-trial submissions PrimeTime principally relied on *Infinity Broad. Corp. v. Kirkwood,* 63 F.Supp.2d 420 (S.D.N.Y. 1999), to support its position that the NFL is entitled only to the $200 minimum statutory damages for innocent infringements. (*See* PrimeTime 10/5/00 Letter.) In *Infinity Broadcasting,* the defendant operated a service that retransmitted radio broadcasts over the telephone. Judge Kaplan rejected defendant's position that the conduct fell under the "passive carrier" or "fair use" exceptions to copyright liability, but found that the defendant was not a "rip-off artist" and "had a well considered position [based on two recognized exceptions under copyright law] that his activities did not infringe [plaintiff]'s rights." *Infinity Broad. Corp. v. Kirkwood,* 63 F.Supp.2d at 425–27. Judge Kaplan did not, however, reduce damages to $200 per infringement, instead awarding the "statutory minimum of $500," *i.e.,* he did not find defendant to be an "innocent infringer." *Id.*

PrimeTime does not cite any other case in either its brief or post-trial letter submission, in support of its innocent infringer claim. (*See generally* PrimeTime 7/10/00 Br. at 7–10; PrimeTime 10/5/00 Letter.) The Court's independent research has not turned up any case where a defendant who knew of the plaintiff's copyright claim but disagreed with the claim was held an "innocent" infringer. Such a defendant may not be a willfull infringer, *see, e.g., Infinity Broadcasting* discussed above, but is not an "innocent" infringer.[16]

Use of the "innocent infringer" damage reduction of § 504(c)(2) appears to have has been limited to cases where the defendant (often unsophisticated) proves that it did not know about plaintiff's copyright and immediately ceased its infringing conduct upon being made aware of plaintiff's copyright claim. *See, e.g., D.C. Comics Inc. v. Mini Gift Shop,* 912 F.2d at 35–36 ("The level of sophistication of the defendant in business is an entirely proper means of determining whether or not his infringement was innocent."); *Warner Bros., Inc. v. Dae Rim Trading, Inc.,* 677 F.Supp. 740 (S.D.N.Y.1988) (finding innocent infringement where defendant bought dolls from wholesaler that, unknown to defendant, were of characters from plaintiff's movie; when defendant learned this, it immediately and unilaterally returned all unsold dolls), *aff'd in relevant part,* 877 F.2d 1120 (2d Cir.1989); *see generally* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][2][a] at 14–56 to 14–57.

The Court finds that PrimeTime is not an "innocent infringer," and consequently the Court will not reduce any statutory damage award to $200 (or any other amount below $500) per infringement pursuant to § 504(c)(2).

**B. To Determine Whether Prime-Time Was "Willfull" and the Proper Level of Statutory Damages, the Court Must Separately Analyze PrimeTime's Conduct During Different Time Periods in the Litigation**

PrimeTime's position that it was not infringing the NFL's copyrights was judi-

---

16. Even if reliance on counsel in the face of a claim of infringement ever could constitute "innocent" infringement, as opposed to merely disproving willfullness, which the Court doubts, PrimeTime has the burden of proof of such "innocence," and it has not met its burden. The record is devoid of any internal memoranda or letters from PrimeTime's lawyers advising PrimeTime about the merits of its position. *See* pages 466, 467, 468, 471 above. Weinstein admitted that PrimeTime was aware of the risk in transmitting NFL games to Canada (Tr. 143–44, 149, 160–01), and testified that "I never really asked [PrimeTime's counsel] . . . what do you think, how risky it is on the scale." (Tr. 160.) Further, although Weinstein stated that the decision to broadcast the copyrighted material was made by persons other than herself (*id.*), PrimeTime failed to call those individuals to testify at trial.

cially rejected during the course of this litigation and consequently, separate analysis is required for infringements occurring during different stages of this lawsuit. *See Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.*, 95 Civ. 8833, 1999 WL 1021565 at *2, 52 U.S.P.Q.2d 1908 (S.D.N.Y. Nov. 10, 1999).

### 1. *PrimeTime's 1997 and 1998 Infringing Transmissions to Canada*

■ It is undisputed that PrimeTime made 123 infringing transmissions to Canada in 1997 and 1998. (*See* Pretrial Order, Stip. ¶¶ f-g; Dkt. No. 52: 11/22/99 Stip. ¶¶ 1–2.) While the NFL argues that these infringements were "committed willfully after repeated advance warnings" (NFL 7/10/00 Br. at 11), the NFL only seeks statutory damages of $10,000 per 1997–98 infringement (*id.*), which the NFL describes as "half of the [maximum] amount for non-willfull infringements." (Tr. 171.)

The $10,000 damage amount sought by the NFL makes it unnecessary for the Court to determine whether PrimeTime's conduct during this period was "willfull." It remains for the Court to determine the appropriate statutory damage award within the $500–$20,000 range of § 504(c)(1). The Court has broad discretion within that range. *See* cases cited at pages 472–74 above.

Some prior cases have awarded the $500 statutory minimum where the defendant's defense was based on a non-frivolous but ultimately unsuccessful legal argument. *See, e.g., Infinity Broad. Corp. v. Kirkwood*, 63 F.Supp.2d 420, 427 (S.D.N.Y. 1999) ("statutory minimum of $500" per infringement awarded where defendant "had a well considered position that his activities did not infringe" and "[a]lthough he ultimately did not prevail, his position certainly was not frivolous"); *National Football League v. Rondor, Inc.*, 840 F.Supp. 1160, 1170 (N.D.Ohio 1993) ($500 per infringement where the "equipment that defendants were using had not previously been judicially determined to be outside the scope of the home use exception"). However, no "mathematical formula or equation" applies. *UMG Recordings, Inc. v. MP3.Com, Inc.*, 00 Civ. 472, 2000 WL 1262568 at *5 (S.D.N.Y. Sept.6, 2000); *see also* cases cited at pages 473–74 above. In this case, having considered all relevant factors and evidence, the Court believes a higher award than $500, but still at the lower end of the spectrum, is appropriate.[17]

---

**17.** Plaintiff's damages and/or defendant's profits are among the factors to be considered, since "[s]tatutory damages are not intended to provide a plaintiff with a windfall recovery." *E.g., Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 569 (S.D.N.Y. 1995). Nevertheless, statutory damages often are used in cases where actual damages cannot be precisely calculated. *See, e.g., Eastern America Trio Prods. Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d at 419 (S.D.N.Y.2000) (awarding statutory damages because "[t]he paucity of evidence presented to the Court makes it impossible to determine the economic benefits and detriments to either party resulting from the copyright infringement"); *RSO Records, Inc. v. Peri*, 596 F.Supp. 849, 862 (S.D.N.Y.1984); *Lauratex Textile Corp. v. Allton Knitting Mills Inc.*, 519 F.Supp. 730 (S.D.N.Y.1981). Moreover, statutory damages can take on a "partially punitive character" to serve a deterrent purpose. *See, e.g., RSO Records, Inc. v. Peri*, 596 F.Supp. at 862; *see also, e.g., F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 ("Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory [deterrence] policy."); *United States Media Corp. v. Edde Entm't Corp.*, 94 Civ. 4849, 1998 WL 401532 at *18 (S.D.N.Y. July 17, 1998) ("[A] statutory damage award ... is designed to serve both compensatory and punitive purposes."). Here, as discussed in the Court's Findings of Fact, the NFL had an exclusive licensing arrangement in Canada and would not have licensed PrimeTime (Tr. 19–21); the NFL, while not able to quantify its damages, testified that PrimeTime's actions interfered with the NFL's marketing strategies (Tr. 29–30, 40, 49–50); and while PrimeTime's activity in Canada may have generated only a small amount of revenue, it considered it important and valuable to be able to transmit NFL games to Canada (Tr. 94–95, 150–52). The Court, therefore, places little weight on the NFL's actual damages or

Accordingly, the Court believes that the appropriate statutory damage amount for PrimeTime's 1997–1998 infringements is $2,500 per infringement. Since there were 123 infringements during the 1997–1998 period, statutory damages for this period total *$307,500*.

### 2. *PrimeTime's September–October 1999 Infringing Transmissions to Canada*

■ PrimeTime transmitted 18 NFL games to Canada in September–October 1999, after Judge McKenna's March 1999 decision denying PrimeTime's motion to dismiss and, for 12 of the 18 transmissions, after Judge McKenna's September 24, 1999 decision granting summary judgment to the NFL. (*See* Pretrial Order, Stip. ¶ h; JX O.) The NFL seeks the maximum willfullness statutory damages of $100,000 for each of the 18 infringements. (NFL 7/10/00 Br. at 12.)

As discussed above, the willfullness standard does not require maliciousness, merely knowledge or reckless disregard:

"[A] court need not find that an infringer acted maliciously to find willfull infringement." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir.1986). "The standard is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility." *Twin Peaks* [*Prods., Inc. v. Publications Int'l, Ltd.*,] 996 F.2d [1366] at 1382 [ (2d Cir.1993) ].

*Castle Rock Entm't v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260, 266–67 (S.D.N.Y. 1997) (Sotomayor, D.J.), *aff'd*, 150 F.3d 132 (2d Cir.1998); *see also* cases cited at pages 475–76 above.

There can be no doubt that PrimeTime's conduct in September–October 1999 was knowing or at least reckless. PrimeTime was aware that NFL game telecasts were copyrighted by the NFL, and PrimeTime further knew the NFL's position that PrimeTime's transmissions to Canada constituted copyright infringement. PrimeTime's reliance on the advice of counsel and on the Ninth Circuit's *Allarcom* decision became unreasonable after Judge McKenna's March 1999 decision denying PrimeTime's motion to dismiss; Judge McKenna unequivocally rejected all of PrimeTime's legal arguments, including its reliance on the Ninth Circuit's *Allarcom* decision. (*See* page 461 above.) PrimeTime knew (or should have known) that with its legal theory demolished, the undisputed facts would entitle the NFL to summary judgment. Nevertheless, PrimeTime "proceeded with business as usual" (Tr. 118; *see also* Tr. 141), despite advice from their attorneys that "it was a possibility and there was a chance" that summary judgment and an injunction would be granted. (Tr. 143; *see* page 469 above.)[18]

While PrimeTime obviously had the legal right to continue the litigation and appeal to the Second Circuit (*see* page 471 below regarding attorneys' fees), it knew or recklessly disregarded that Judge McKenna's decision on the motion to dismiss sounded the death knell for PrimeTime's legal defense. PrimeTime was obliged to adjust its business conduct accordingly (*i.e.*, stop transmissions to Canada) or pay the price. PrimeTime's conduct in this time period clearly was willfull.

Indeed, 12 of the 18 infringements in this period occurred after Judge McKenna's September 24, 1999 summary judgment decision. (*See* JX O.) While that

---

PrimeTime's profits in arriving at the appropriate statutory damage award.

**18.** Weinstein could not, or would not, quantify how "likely" PrimeTime's lawyers said it was that summary judgment for the NFL would be granted as a result of Judge McKenna's March 1999 decision—and the Court has

found Weinstein's evasiveness and the absence of evidence as to counsel's specific advice at that stage of the case to be very telling against PrimeTime. (*See* page 469 above.) The Court finds that PrimeTime and its counsel should have been able to predict Judge McKenna's summary judgment decision from his decision denying the motion to dismiss.

decision held that a permanent injunction would issue but did not actually issue the injunction, PrimeTime should have ceased its transmissions of NFL games to Canada at that point. PrimeTime chose not to do so. Indeed, PrimeTime made the business decision that until a formal injunction was entered, it would not black out its transmissions of NFL games to Canada. (Tr. 145–48, quoted at page 470 above.) PrimeTime's conduct clearly demonstrated chutzpah, or in more legal parlance, willfullness.[19]

Courts in this Circuit have found willfullness in similar—indeed, less egregious—circumstances. For example, in *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1381–82 (2d Cir. 1993), the defendant published a guide book containing detailed plot summaries of episodes of plaintiff's copyrighted television program "Twin Peaks." 996 F.2d at 1370. Defendant claimed that because it believed its use was covered by the "fair use" defense, and had received advice of counsel to that effect, its infringement was not willfull. *Id.* at 1373, 1382. The district court found willfull infringement and the Second Circuit affirmed. *Id.* at 1382.

Similarly, in *Castle Rock Entm't v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260 (S.D.N.Y.1997) (Sotomayor, D.J.), *aff'd*, 150 F.3d 132 (2d Cir.1998), the defendant published a trivia book concerning the copyrighted television show "Seinfeld." 955 F.Supp. at 261. Then–District Judge Sotomayor found willfullness based on the fact that: (1) the copyright notices on each "Seinfeld" episode put defendant on notice of plaintiff's copyright, (2) "defendants are sophisticated with respect to such matters," and (3) defendant continued to publish the book after receiving a cease and desist letter. *Id.* at 267. Similar to *Castle Rock*, here (1) PrimeTime knew the NFL

game telecasts were copyrighted by the NFL, (2) PrimeTime is a sophisticated corporation and was represented by experienced copyright counsel, and (3) PrimeTime continued to infringe after not only the NFL's cease and desist letters but also after a judicial decision denying PrimeTime's motion to dismiss that completely rejected PrimeTime's legal defense, and further after the Court's summary judgment decision. A finding of willfullness here follows *a fortiori* from *Castle Rock*. *See also, e.g., Kepner–Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288–89 (2d Cir.1999) (upholding award of maximum $100,000 statutory damages where defendant, who professed a "reasonable and good faith belief that his use ... was protected," continued his infringing activities after a court in a related litigation enjoined a related company from using the material at issue); *N.A.S. Import, Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 253 (2d Cir. 1992) (overturning district court finding that defendant's conduct was not willfull where defendant continued to sell infringing article after its own attorney represented that sales would cease; "[w]hile [defendant's claimed] language barrier might account for some initial confusion, that excuse evaporated once [defendant] hired an attorney.").

The Court finds PrimeTime's conduct in September–October 1999 to be willfull and awards the maximum $100,000 statutory damages for each of the 18 infringements in this period, totaling $1.8 million.

### 3. PrimeTime's Infringing Transmissions During November 1999–January 2000 While the Second Circuit's Stay of the Injunction Was In Effect

■ The NFL seeks $10,000 per game for the thirty-three infringements that

---

**19.** The Court notes that this is not the first time that PrimeTime has been found to be a willfull infringer. *See ABC, Inc. v. PrimeTime 24*, 184 F.3d 348, 354 (4th Cir.1999) ("A carrier must employ some objective screening method to ensure compliance with the ['unserved household' domestic requirement of

the Satellite Home Viewer] Act—a duty that PrimeTime utterly failed to meet.... [I]ts method of complying with the Act was not, as PrimeTime claims, an act of good faith, but rather was to engage in wishful thinking."), *aff'g* 17 F.Supp.2d 467, 475–76 (M.D.N.C. 1998).

took place between November 21, 1999 and January 30, 2000, after the Second Circuit stayed the permanent injunction. (NFL 7/10/00 Br. at 12).

Because the NFL seeks damages for these infringements within the § 504(c)(1) range, the Court need not decide if Prime-Time's conduct in this period was willfull. Obviously, a decision to stay an injunction is not a decision on the merits, but the Court can see how PrimeTime could take some comfort from the stay, since a factor in a stay decision is the substantial possibility of the applicant's likelihood of success on the merits. *See Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987); *Cooper v. Town of East Hampton,* 83 F.3d 31, 36 (2d Cir.1996); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995); *Hirschfeld v. Board of Elections in the City of New York,* 984 F.2d 35, 39 (2d Cir.1993). But PrimeTime knew that Judge McKenna had found it liable for copyright infringement and PrimeTime knew that if the Second Circuit affirmed that decision, PrimeTime would have to pay damages to the NFL. (*See* PrimeTime 10/21/99 Stay Brief to 2d Cir. at 9–10: "Should the NFL win on appeal it can simply seek to multiply the statutory damage rate determined by the District Court times the number of additional retransmissions of NFL game telecasts by Prime-Time 24 between the present date and the date of [the Second Circuit's] ultimate determination on the merits."). Weinstein testified that PrimeTime "understood there was a risk" in continuing to transmit NFL games to Canada during the appeal, and PrimeTime elected to take that risk once the injunction was stayed. (Tr. 149–50.)

PrimeTime having made the decision to take the risk and again "proceed with business as usual" despite two decisions by Judge McKenna finding its conduct to constitute copyright infringement, and considering all other appropriate factors and evidence, the Court finds that statuto-ry damages of $10,000 per infringement is appropriate for this period.

This award is well within the Court's discretion and in harmony with other infringement awards. *See, e.g., Eastern America Trio Prods., Inc. v. Tang Elec. Corp.,* 97 F.Supp.2d 395, 419 (S.D.N.Y. 2000) (awarding $12,500 per infringed work where defendant copied plaintiff's photographs, "blatantly disregarding the clear copyright notice"); *National Football League v. Touch Down Eddies, Inc.,* No. 95–2113 (M.D.Fla. June 14, 1996) (unpublished order awarding $10,000 in statutory damages for defendant's violation of the NFL's copyright by interception of satellite signal and public broadcast of same); *National Football League v. Boss Enter., Inc.,* No. 94–6969 (C.D.Cal. June 27, 1995) (same; 2 unpublished orders, awarding $5,000 in statutory damages against one defendant and $15,000 against another defendant); *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560 (S.D.N.Y.1995) (Sotomayor, D.J.) (awarding $10,000 for each infringement of licensed works and $15,000 for each infringement of unlicensed works); *Home Box Office v. Champs of New Haven, Inc.,* 837 F.Supp. 480, 484 (D.Conn.1993) (awarding $10,000 in statutory damages where defendants intercepted and publicly broadcast HBO programs); *National Football League v. Chickies Club South, Inc.,* No. 92–2667 (S.D.Fla. Apr. 23, 1993) (same as above NFL cases; using $10,000 per infringement rate, imposes $20,000 in statutory damages against one defendant for 2 infringements and $40,000 against another defendant for 4 infringements).

Accordingly, the Court awards the NFL statutory damages of $330,000 ($10,000 times 33 transmissions to Canada) for the infringements in the November 1999–January 2000 period.

**4. *PrimeTime's Six "Inadvertent" Transmissions in August–September 2000 After the Second Circuit Affirmed the Injunction***

██ After the Second Circuit affirmed Judge McKenna's summary judgment de-

cision and injunction in April 2000, PrimeTime intended to comply with the injunction by "blacking out" NFL games from its transmissions to Canada. (Tr. 119.) That proved more difficult than PrimeTime expected, and when the next football season began, PrimeTime admits that based on technical, equipment or personnel problems, its efforts failed for all or part of six NFL games in August–September 2000. (Tr. 124–29, 154–55; 9/19/00 Supp. Stip. & Order ¶¶ 2–12; see page 464 n. 5 & pages 469–70 above.)

The NFL seeks $100,000 per infringement for these six infringements. (Tr. 8, 170–71.) The NFL contends that these infringements are "in violation of the permanent injunction [and] . . . in contempt of court." (Tr. 8.) The NFL concedes that PrimeTime "did not intend [to] show these games" (Tr. 8), but argues that the maximum willfullness statutory damages of $100,000 are appropriate because, in the NFL's view, "PrimeTime 24's efforts to comply with the court's orders were woefully inadequate" and "PrimeTime 24 needs a strong disincentive to future violations." (Tr. 8.)

Based on Weinstein's testimony, the Court agrees that PrimeTime did not intend to transmit these 6 NFL games to Canada. (See page 464 n. 5 & pages 469–70 above.) The evidence is also clear, however, that PrimeTime made a conscious business decision not to make any preparatory efforts to black out the games until after not only Judge McKenna's summary judgment decision but the actual entry of the injunction. (Tr. 119, 144, 145–48.) When PrimeTime finally made efforts to black out NFL games to Canada, PrimeTime discovered that it would be more difficult than expected to effect the blackout. (Tr. 144, 164.) [20] While PrimeTime should not benefit from its decision not to comply with court decisions until the very last minute, an award of $100,000 per infringement for the accidental transmissions in this period would be excessive. The Court finds that an award of $20,000 per infringement is appropriate, for a total of $120,000 for the six infringements in August–September 2000.[21]

### 5. *Statutory Damages: Conclusion*

For the reasons stated above, the Court awards the NFL statutory damages of $2,557,500, as follows:

| Period | No. of Infringements | Statutory Damages | Total |
|---|---|---|---|
| 1997–1998 | 123 | $ 2,500 | $ 307,500 |
| Sept.-Oct.1999 | 18 | $100,000 | $1,800,000 |
| Nov.1999–Jan.2000 | 33 | $ 10,000 | $ 330,000 |
| Aug.-Sept.2000 | 6 | $ 20,000 | $ 120,000 |
| | | | $2,557,500 |

## III. *ATTORNEYS' FEES AND COSTS*

The Copyright Act grants the Court discretion to award costs and reasonable attorneys' fees to a prevailing party in a Copyright infringement action:

---

20. There is no evidence that PrimeTime made any effort regarding the technical aspect of a blackout during the period the Second Circuit stay of the injunction was in effect. The six games in issue represent the very beginning of the first football season after the April 2000 Second Circuit affirmance of Judge McKenna's summary judgment decision and injunction.

21. Accordingly, the Court need not decide whether PrimeTime's conduct in this period is "willfull," *i.e.*, knowing or reckless. There is a good argument that PrimeTime's conduct should be considered willfull, but the Court still would award statutory damages of $20,000 for each of these 6 infringements and *not a higher amount.*

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party .... Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505.

The NFL argues that it is entitled to attorneys' fees because: (1) the NFL is the undisputed prevailing party, (2) PrimeTime's infringements were willfull, and (3) the alleged novelty of the issues and PrimeTime's position in the case is irrelevant in light of PrimeTime's refusal to cease its infringing conduct in spite of, and in accordance with, court rulings at various stages of the lawsuit. (Dkt. No. 70: NFL 9/13/00 Br.) The NFL seeks $554,231.79 in fees and $45,792.99 in costs. (Dkt. No. 73: NFL 10/6/00 Supp. Petition for Attorneys' Fees & Costs.)

PrimeTime argues that awarding attorneys' fees is discretionary, and that the presence of unsettled legal issues, and the fact that PrimeTime litigated in good faith and its position was not frivolous, weigh against an award of attorneys' fees. (Dkt. No. 72: PrimeTime 9/27/00 Br. at 1–7.) In the event the Court were to disagree, PrimeTime does not challenge the amount of attorneys' fees or costs sought by the NFL. (PrimeTime 9/27/00 Br. at 1: "PrimeTime 24 does not take issue with the amount required by plaintiff [NFL] but instead the League's entitlement to any fees at all.")

### A. *Applicable Legal Standard: Attorneys' Fees*

■ The Supreme Court has made clear that attorneys' fees in copyright ac-

tions are not automatic to the prevailing party. Rather, "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534, 114 S.Ct. 1023, 1033, 127 L.Ed.2d 455 (1994).[22] The Court's discretion is broad and subject to review only for abuse of discretion. *E.g., Matthew Bender & Co. v. West Publ'g Co.,* 240 F.3d 116, 120–21 (2d Cir.2001); *Clark v. Hudson Bay Music, Inc.,* No. 96–7251, 104 F.3d 351 (table), 1996 WL 547186 at *2 (2d Cir. Sept. 26, 1996).

" 'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.' " *Fogerty v. Fantasy,* 510 U.S. at 534, 114 S.Ct. at 1033; *accord, e.g., Matthew Bender v. West,* 2001 WL 50857 at *4; *Clark v. Hudson Bay Music, Inc.,* 1996 WL 547186 at *1. The Supreme Court has identified the "factors [that] may be used to guide courts' discretion" to include " 'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.' " *Fogerty v. Fantasy,* 510 U.S. at 533 n. 19, 114 S.Ct. at 1033 n. 19; *accord, e.g., Matthew Bender v. West,* 2001 WL 50857 at *4; *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d at 1011; *Clark v. Hudson Bay Music, Inc.,* 1996 WL 547186 at *1; William F. Patry & Rebecca F. Martin, *Copyright Law & Practice: 2000 Cumulative Supplement* at 308–09 & n. 269 (quoting *Fogerty v. Fantasy* and, in footnote, citing additional cases).[23]

---

**22.** *Accord, e.g.,* William F. Patry & Rebecca F. Martin, *Copyright Law & Practice: 2000 Cumulative Supplement* at 308–12; *see also, e.g., Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 74 (2d Cir.1999) (" 'We may reverse an award of attorney's fees only if the district court applied the wrong legal standard or abused its discretion.' ") (quoting *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1012 (2d Cir.1995)); *N.A.S.*

*Import, Corp. v. Chenson Enter., Inc.,* 968 F.2d 250, 253–54 (2d Cir.1992).

**23.** *See also, e.g., Rosciszewski v. Arete Assoc., Inc.,* 1 F.3d 225, 234 (4th Cir.1993); *Infinity Broad. Corp. v. Kirkwood,* 63 F.Supp.2d 420, 427 (S.D.N.Y.1999); *United States Media Corp. v. Edde Entm't, Corp.,* 94 Civ. 4849, 1998 WL 401532 at *27 (S.D.N.Y. July 17, 1998) ("The relevant factors include the rela-

The "objective reasonableness" factor is to be accorded "substantial weight" in the determination of whether to award attorneys' fees to the prevailing party in a copyright case. *E.g., Matthew Bender v. West,* 2001 WL 50857 at *5 (citing cases). "This is not to say, however, that a finding of objective reasonableness necessarily precludes the award of fees. In an appropriate case, the presence of other factors might justify an award of fees despite a finding that the nonprevailing party's position was objectively reasonable." *Matthew Bender v. West,* 2001 WL 50857 at *6.

"[T]he amount of damages awarded [also] is a factor that may be considered in arriving at an appropriate award of attorney's fees." *N.A.S. Import, Corp. v. Chenson Enter., Inc.,* 968 F.2d 250, 254 (2d Cir.1992).

Considerations of deterrence may support an award of attorneys' fees to the prevailing party where none of the other relevant factors justify denying such an award, especially when willfull infringement has been found. *See, e.g., Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 289 (2d Cir.1999); *Broadcast Music, Inc. v. R. Bar of Manhattan, Inc.,* 919 F.Supp. at 661; *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. at 570; *see also, e.g., Yurman Design, Inc. v. PAJ, Inc.,* 93 F.Supp.2d 449, 464 (S.D.N.Y.2000) (defendant's "willfull infringement in this case merits such an award" of attorneys' fees).

Similarly, "bad faith in the conduct of the litigation is a valid ground for an award of [attorneys'] fees," even where the nonprevailing party's position on the merits of the copyright issue was objectively reasonable. *E.g., Matthew Bender v. West,* 2001 WL 50857 at *8. In such a case, "[a]ny fees [the court] awards should be related to costs or expenses incurred as a

direct result of bad faith conduct by" the non-prevailing party. *Id.* at *10.

### B. *Applicable Legal Standard: Costs*

 The Copyright Act allows for costs as a matter of the court's discretion, *see* 17 U.S.C. § 505 (quoted at page 483 above). The Court also may rely on Rule 54(d) of the Federal Rules of Civil Procedure, which provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." The categories of allowable costs under the Copyright Act and Rule 54 are the same. *See, e.g., United States Media Corp. v. Edde Entm't, Inc.,* 94 Civ. 4849, 1999 WL 498216 at *7 (S.D.N.Y. July 14, 1999) ("The weight of authority indicates that the 'full costs' referred to in the Copyright Act are nothing more than the costs allowable under 28 U.S.C. § 1920."); *In Design v. K–Mart Apparel Corp.,* 87 Civ. 8397, 1996 WL 4122 at *7 (S.D.N.Y. Jan.3, 1996); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 825 F.Supp. 361, 366–67 (D.Mass.1993) ("28 U.S.C. § 1920 defines the 'costs' that may be awarded under more general authority, such as ... Fed.R.Civ.P. 54 and, in this case, § 505 of the Copyright Act."), *aff'd,* 36 F.3d 1147 (1st Cir.1994).

Thus, "[a]lthough not required to do so, courts routinely award costs to the prevailing party in copyright cases." *Antenna Television, A.E. v. Aegean Video, Inc.,* No. 95–CV–2328, 1996 WL 298252 at *14 (E.D.N.Y. Apr. 23, 1996) (citations omitted).

### C. *Analysis*

 In its fee application, the NFL recognizes that this is a case of first impression in this Circuit and refers to the

---

tive merit of the parties' respective positions, the bad faith or willfullness (or lack of it) of either side, and (in the case of prevailing plaintiff) the need for deterrence of future infringements by the defendant and others."); *Adsani v. Miller,* 94 Civ. 9131, 1996 WL 531858 at *13 (S.D.N.Y. Sept.19, 1996) (add-

ing to *Fogerty* factors "the relative financial strength of the parties"); *Broadcast Music, Inc. v. R. Bar of Manhattan, Inc.,* 919 F.Supp. 656, 660 (S.D.N.Y.1996); *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 569 (S.D.N.Y.1995) (Sotomayor, D.J.).

complexity of the case in support of its fee application:

> The principal legal issue in this case-the application of U.S. copyright law to the secondary transmission by satellite of network programming originating in this country to locations outside the United States-was an issue of first impression in this Circuit. The briefing on this issue required extensive research into applicable precedent in this Circuit and elsewhere; indeed, one potential obstacle overcome by plaintiff was an arguably applicable decision by the Ninth Circuit Court of Appeals, *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381 (9th Cir.1995), that, if followed, could have led to a different result.

(NFL 9/13/00 Br. at 10.)

The novelty and complexity of the issue, and the contrary view of the Ninth Circuit, however, actually point (along with other factors) to the denial of the NFL's request for attorneys' fees. Despite the deficiencies in PrimeTime's reliance on counsel evidence, discussed repeatedly above, the Court credits the testimony at least to this extent: before this litigation began, and until Judge McKenna's March 1999 decision denying PrimeTime's motion to dismiss, PrimeTime's position in reliance on the Ninth Circuit's view was not asserted in bad faith nor objectively unreasonable.

While the Court has found PrimeTime's business conduct in September–October 1999 to constitute willfull infringement (*see* pages 479–80 above), PrimeTime was entitled to continue this litigation in order to obtain a decision from the Second Circuit (and even now, PrimeTime is pursuing a cert. petition to the Supreme Court). While PrimeTime should have ceased transmitting NFL games to Canada after Judge McKenna's decision on the motion to dismiss, PrimeTime was entitled to pursue the litigation to its conclusion. *But cf. Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 95 Civ. 2144, 1997 WL 324086 at *1 (S.D.N.Y. June 13, 1997) (at-

torneys' fees justified as deterrent where infringements were blatant and willfull and after some plaintiffs obtained preliminary injunction, defendant continued to infringe by copying articles from plaintiffs' other publications not covered by the injunction).

PrimeTime's conduct of the litigation was never in bad faith. It did not seek to delay the litigation or engage in any litigation misconduct. Indeed, PrimeTime and its counsel entered into appropriate stipulations, thereby reducing the time needed for trial.

Finally, in light of the Court's $2.5 million statutory damage award to the NFL, the NFL has been appropriately compensated, and that damage award serves as sufficient deterrence to PrimeTime and others.

For all these reasons, the Court in its discretion declines to award attorneys' fees to the NFL. *See, e.g., Infinity Broad. Corp. v. Kirkwood*, 63 F.Supp.2d 420, 427–28 (S.D.N.Y.1999) (attorneys' fees not awarded where defendant was not a "rip-off artist," had a "well considered [but ultimately unsuccessful] position that his activities did not infringe," and "the manner in which [defendant] ... conducted this case was exceptionally responsible in that he readily stipulated to facts and expeditious modes of proceeding"); *Bourne Co. v. Walt Disney Co.*, 91 Civ. 0344, 1994 WL 263482 at *2 (S.D.N.Y. June 10, 1994) ("Among the factors that may justify the denial of fees to a prevailing plaintiff is 'the presence of a complex or novel issue of law that the defendants litigate vigorously and in good faith.'"), *aff'd*, 68 F.3d 621 (2d Cir.1995); *Bourne Co. v. MPL Communications, Inc.*, 678 F.Supp. 70, 72 (S.D.N.Y.1988) (court declines to award attorneys' fees "[g]iven the novelty of the issues involved in this action, and the lack of any bad faith on the part of defendants"); *Clark v. Hudson Bay Music, Inc.*, No. 96–7251, 104 F.3d 351 (table), 1996 WL 547186 (2d Cir. Sept.26, 1996) (affirming the district court's decision not to

award any attorneys' fees because plaintiff had been adequately compensated in royalties for his song, defendants had a reasonable defense, and an attorneys' fee award would have no deterrent value); *see also, e.g., Applied Innovations, Inc. v. Regents of the Univ. of Minn.,* 876 F.2d 626, 638 (8th Cir.1989) (district court did not abuse its discretion to deny attorneys' fees to prevailing plaintiff "because the litigation involved numerous complex or novel questions which defendant had litigated vigorously and in good faith"); 4 Melville D. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.10[D][1] at 14–148 to 14–149 ("attorneys' fees should not be awarded if ... a novel or complex question of law is involved and the losing party is acting in good faith" in the litigation) (fns. citing cases omitted).

The issue of costs is not governed by similar issues. As discussed above, the prevailing party is entitled to costs under Fed.R.Civ.P. 54(d), and courts generally award costs in copyright cases. (*See* cases cited at page 484 above.) PrimeTime has not addressed the NFL's request for costs. (*See generally* PrimeTime 9/27/00 Br.)[24] Accordingly, the Court awards the NFL $45,792.99 in costs. *See, e.g., United States Media Corp. v. Edde Entm't Corp.,* 94 Civ. 4849, 1998 WL 401532 at \*27 (S.D.N.Y. July 17, 1998) ("Under the circumstances, including the willfullness of the conduct by [defendants], we view this as an appropriate case in which to award plaintiff its full costs.").

## CONCLUSION

For the reasons set forth above, the Court awards the NFL $2,557,500 in statutory damages for PrimeTime's infringements, and $45,792.99 in costs. The Court declines to award the NFL attorneys' fees.

**24.** To the extent the NFL's cost application may seek cost categories that are an adjunct to attorneys' fees but are beyond those permitted by 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54 and S.D.N.Y. Local Civil

The Clerk of Court is to enter judgment accordingly.

SO ORDERED.

Rule 54.1(c), PrimeTime has waived any objection by its decision not to challenge the amount of attorneys' fees or costs sought by the NFL.